**CHARLESGATE NURSING CENTER, a limited partnership, Davenport Associates, Inc., Charlesgate Nursing Corp., Robert S. Gershkoff, Marcell A. Richard, and Paul S. Davenport, as General Partners,**

v.

**The STATE OF RHODE ISLAND and Providence Plantations, James E. O'Neil, in his capacity as Attorney General of The State of Rhode Island and Providence Plantations, the City of Providence, Colonel Walter J. Clark, in his capacity as Chief of Police of The City of Providence, District 1199 of the New England Health Care Employees Union, National Union of Hospital and Health Care Employees, AFL–CIO, United Health Care Employees, a Division of R.I. Workers Union, Local 76, S.E.I.U. AFL–CIO.**

Civ. A. No. 88–0401–T.

United States District Court,
D. Rhode Island.

Oct. 12, 1989.

---

Thomas S. Brown, Providence, R.I., for plaintiffs.

Terrence Tierney, Providence, R.I., for Atty. Gen.

Edward Clifton, Providence, R.I., for City of Providence.

## OPINION AND ORDER

TORRES, District Judge.

This is an action to declare void and enjoin the defendants from enforcing a Rhode Island statute that makes it a crime for an employer to utilize the services of a

third party in recruiting or hiring workers to replace those who are engaged in a labor strike.

## FACTS

The facts underlying this litigation are set forth in an "Agreed Statement of Facts" and may be summarized as follows. The plaintiffs operate a nursing home known as Charlesgate which is located in the City of Providence. Charlesgate is an employer subject to the provisions of the National Labor Relations Act (the "NLRA"). The collective bargaining agents for its employees are District 1199 of the New England Health Care Employees Union, National Union of Health Care Employees, AFL–CIO and United Health Care Employees, a Division of Rhode Island Workers Union, Local 76, S.E.I.U., AFL–CIO (the "Unions"). On June 2, 1988, the members of both unions went on strike. In order to provide continued services to its patients, Charlesgate hired temporary replacement employees through various nursing pools which function as employment agencies for health care workers.

The actions of both Charlesgate and the nursing pools apparently violated General Laws of Rhode Island (1956) (1986 Reenactment) §§ 28–10–10 and 28–10–12, which provide as follows:

28–10–10. Recruitment prohibited—It shall be unlawful for any person, partnership, agency, firm or corporation, or officer or agent thereof, to knowingly recruit, procure, supply or refer any person who offers him or herself for employment in the place of an employee involved in a labor strike or lockout in which such person, partnership, agency, firm, or corporation is not directly interested.

. . . . .

28–10–12. Agency for procurement.—It shall be unlawful for any person, partnership, firm or corporation, or officer or agent thereof, involved in a labor strike or lockout to contract or arrange with any other person, partnership, agency, firm or corporation to recruit, procure, supply, or refer persons who offer themselves for employment in the place of employees involved in a labor strike or lockout for employment in place of employees involved in such labor strike or lockout.

The penalties for violating those statutes are contained in R.I. Gen.Laws § 28–10–14 which states:

28–10–14. Penalty for violations.—Any person, partnership, agency, firm or corporation violating §§ 28–10–10 ... [or] 28–10–12 ... shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not more than five hundred ($500) for each person recruited, supplied, procured, referred or employed or to suffer imprisonment for a term not exceeding one year, or both, at the discretion of the court.

Citing these statutes, the unions notified nursing pools throughout the state that it was unlawful for them to supply replacement workers to Charlesgate during the pendency of the strike. In addition, the unions urged the City of Providence (the "City") and the Rhode Island Attorney General (the "Attorney General") to prosecute Charlesgate. Charlesgate responded with this action in which it contends that the aforesaid statutes are unconstitutional in that they have been preempted by federal law.

When suit was begun, this Court denied Charlesgate's request for a temporary restraining order because, at that time, both the City and the Attorney General were uncertain as to the statutes' application and, therefore, there was no imminent threat of prosecution. Shortly thereafter, the Attorney General issued an opinion concluding that the statute was presumptively valid. At the same time, the City expressed an intent to prosecute Charlesgate. However, the strike ended before any such action was initiated.

Termination of the strike produced three additional sequelae that affect the procedural posture of this case and the issues presented. First, it induced the plaintiffs to dismiss the unions from the case. Second, it prompted two associations repre-

senting hospitals and nursing homes (i.e. the Hospital Association of Rhode Island ("HARI") and the Rhode Island Health Care Association ("RIHCA"), respectively) to seek to intervene as plaintiffs. Finally, it has caused the remaining defendants to move to dismiss the complaint as moot.

The questions presented may be summarized as follows:

1. Should HARI and RICHA be permitted to intervene?

2. Does termination of the strike render Charlesgate's complaint moot?

3. Should this Court abstain from ruling on the constitutionality of the Rhode Island statutes?

4. Have the statutes, in question, been preempted?

The Court will consider these questions, in turn.

### Intervention and Standing

■ HARI and RICHA move to intervene pursuant to Fed.R.Civ.P. 24(b)(2) which states:

(b) *Permissive Intervention.* Upon timely application, anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

Whether intervention should be allowed pursuant to this provision is a matter committed to the discretion of the Court. The principal factor to be considered in making that determination is the effect intervention will have on the fair, efficient and expeditious resolution of the case. Thus, the rule requires that:

In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

In this case, the motion to intervene was filed within a few weeks after suit was begun, and the prospective intervenors have agreed to adhere to any schedule established by the Court. Therefore, there is no question that the movants' application was timely and that their intervention will not result in any delay.

In addition, the requirement of common issues is clearly satisfied. The claims advanced by HARI and RIHCA are virtually identical to those made by Charlesgate. The prospective intervenors assert that several of their members face the prospect of labor strikes when their collective bargaining contracts expire. They go on to allege that, in the event of such strikes, they would be required to use temporary employees supplied by health care pools in order to adequately care for their patients. Like Charlesgate, they seek a declaration that the aforesaid statutes have been preempted by federal law. In fact, the prospective intervenors are even represented by the same counsel as Charlesgate.

Given the timeliness with which HARI and RIHCA have acted and the congruence between the issues they raise and those already before the Court, it is difficult to see any way in which the present parties would be unfairly prejudiced by intervention. Nevertheless, the defendants advance two other reasons why they say intervention should be denied. First, they contend that the interests of HARI and RIHCA are adequately represented by Charlesgate. Second, they assert that HARI and RIHCA lack standing to challenge the statutes in question.

The first argument may be disposed of rather summarily. Rule 24(a) provides that there is no *right* to intervene if the interest asserted by the prospective intervenor is adequately represented by an existing party. However, HARI and RICA seek to intervene pursuant to R. 24(b) which deals with *permissive* intervention. Under that rule, adequacy of representation is, at most, merely a factor to be considered by the Court in exercising its discretion. In this case, that factor is clearly outweighed by the strong interest HARI and RIHCA have in the outcome and by the fact that their intervention will neither interject new issues into the case, delay adjudication nor unfairly prejudice the parties.

■ In asserting that HARI and RIHCA lack standing, the defendants argue that strikes against the members of those asso-

ciations are merely future possibilities and that, redress may not be sought unless and until those possibilities materialize. Analysis of that argument must begin with the general rule that, in order to have standing to invoke the jurisdiction of a federal court, a prospective litigant must demonstrate an injury that is "distinct and palpable" as opposed to "abstract," "conjectural" or "hypothetical." *Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984).

In this case, while none of HARI's or RIHCA's other member institutions have yet been struck, the likelihood of strikes is more than a figment of their imaginations. The prospective intervenors allege that many of their member institutions are parties to collective bargaining contracts that are scheduled to expire. They further allege that one of those institutions has received a strike notice from its union. In addition, they aver that they are already heavily dependent on temporary health care workers supplied by nursing pools and that, during a strike, they would be required to increase that dependence in order to provide adequate care for their patients. These allegations, coupled with Charlesgate's experience and the City's avowed intention to enforce the statutes in question, make the prospect that one of these institutions will be prosecuted more real than imaginary.

It should be noted that even such a well founded apprehension of future injury is not, by itself, sufficient to confer standing. Here, however, the anticipated harm takes the form of criminal penalties. Hence, the intervenors come within the rule that one demonstrating a realistic danger of prosecution need not expose himself to criminal sanctions in order to contest the constitutionality of a statute. *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979). That principle is particularly applicable in a case, such as this one, where the press of events would likely prevent an effective challenge in any other manner. Thus, if the intervenors are required to wait until a strike occurs before they are permitted to file suit, they will almost certainly be prosecuted before the issue can be litigated.

In short, since there is a reasonable probability that one or more of HARI's or RIHCA's members may be prosecuted and since there is no other way for them to challenge the constitutionality of the statutes at issue without exposing themselves to criminal penalties, they have sufficient standing to intervene.

### Mootness

■ The defendants urge that Charlesgate's complaint be dismissed because termination of the strike has rendered it moot. The doctrine of mootness is rooted in Article III of the United States Constitution which limits the jurisdiction of federal courts to actual cases and controversies. *See North Carolina v. Rice,* 404 U.S. 244, 245–46, 92 S.Ct. 402, 403–04, 30 L.Ed.2d 413 (1971) (per curiam). To put it another way, the courts lack jurisdiction to decide disputes that have become academic due to intervening events.

However, the fact that the conduct giving rise to a suit has been terminated does not render the case moot if it is likely to recur under circumstances that prevent its legality from being resolved. Thus, the actual case or controversy requirement is satisfied where there is a reasonable expectation that the offending conduct will be repeated in the future for periods of such brief duration that there will be no opportunity for a judicial determination before the conduct again ceases. *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183–84, 71 L.Ed.2d 353 (1982) (per curiam); *Sosna v. Iowa,* 419 U.S. 393, 399–400, 95 S.Ct. 553, 557–58, 42 L.Ed.2d 532 (1975). This "evading review" exception has been specifically applied to disputes arising out of labor strikes that ended before the issues could be litigated. *Super Tire Eng'g Co. v. McCorkle,* 416 U.S. 115, 126, 94 S.Ct. 1694, 1700, 40 L.Ed.2d 1 (1974) (employer's suit challenging welfare benefits to striking workers is an issue capable of repetition yet evading review).

As previously noted, in this case there is a reasonable expectation that Charlesgate may be struck again in the future and that it will be required to hire replacement workers through nursing pools. In that event, there is an equally reasonable expectation that Charlesgate will be threatened with prosecution under circumstances that will, once more, prevent it from obtaining a determination regarding the constitutionality of the challenged statutes without subjecting itself to criminal penalties. Consequently, Charlesgate's claim falls squarely within the "capable of repetition yet evading review" exception to the mootness doctrine.

However, that is not the only rock upon which the defendants' motion founders. Even if another strike fails to materialize, Charlesgate is and will continue to be impacted by the statutes at issue. First of all, it is subject to prosecution for having hired replacement workers through nursing pools during the pendency of the *past* strike. While there is nothing in the record indicating that the defendants have initiated such a prosecution, neither is there any suggestion that they have disclaimed any intent to do so. Indeed, the City's expression of an unequivocal intention to enforce the statute suggests that such prosecution is a possibility. *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974). Consequently, the threat of prosecution will continue until the applicable three year statute of limitations expires. R.I.Gen. Laws § 12–12–17.

In addition, it is obvious that the mere existence of the statute weakens Charlesgate's bargaining position vis à vis, its unions. The threat of prosecution for utilizing one of its principal weapons for countering a strike (i.e. hiring replacement workers through nursing pools) will clearly lessen its ability to negotiate effectively during the collective bargaining process.

### Abstention

■ The final barrier in the road leading to the merits of the plaintiffs' preemption claim is the defendants' contention that the Court should abstain from deciding the constitutionality of the challenged statutes in accordance with the doctrine enunciated in *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1946). However, the defendants' reliance on *Pullman* is misplaced. *Pullman* abstention requires federal courts to refrain from deciding the constitutionality of state statutes when they are "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question." *Harman v. Forssenius*, 380 U.S. 528, 534–35, 85 S.Ct. 1177, 1181–82, 14 L.Ed.2d 50 (1965). It springs from considerations of federalism and comity and is designed, in part, to give the state courts an opportunity to construe ambiguities in their own statutes before the constitutionally of those statutes is determined.

In this case there is nothing ambiguous about the challenged statutes. They clearly make it a crime for an employer to utilize the services of nursing pools to recruit or hire replacements for striking employees and for a nursing pool to supply such replacements. In fact, that is precisely how the Attorney General, himself, has interpreted the statutes. It is difficult to see how a state court or anyone else could reach a different conclusion. Consequently, *Pullman* is inapplicable, and abstention would serve no purpose.

### Preemption

■ The doctrine of preemption is a product of the Supremacy Clause of the United States Constitution.[1] Generally speaking, it prevents states from enacting laws that conflict with federal statutes or interfere with the accomplishment of their purposes.

---

1. The Supremacy Clause is contained in Art. VI, cl. 2 which states in relevant part, as follows: This Constitution and the Laws of the United States which shall be made in pursuance thereof ... shall be the supreme Law of the Land ... any thing in the Constitution or laws of any State to the contrary notwithstanding.

There are two types of preemption. Express preemption occurs when Congress explicitly states an intent to exclude state regulation. Implied preemption refers to instances in which such an intent may be inferred from the circumstances. Implied preemption takes several forms. One consists of situations in which the scheme of federal regulation is so pervasive or the federal interest in the subject matter regulated is so dominant that there is no room for state action. Another encompasses cases in which Congress has not entirely occupied the field, but the state regulation at issue conflicts with federal law or stands as an obstacle to the accomplishment of its objectives. *See Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Dev. Comm'n*, 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983).

No matter what the circumstances, the critical inquiry in any preemption analysis is "whether Congress intended that federal regulation supersede state law." *Norris v. Lumbermen's Mutual Casualty Co.*, 881 F.2d 1144, 1147 (1st Cir.1989) (quoting *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986)).

There are two preemption doctrines that apply to the field of labor relations. The first is set forth in *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). It prohibits states from regulating activity that is actually or arguably protected or prohibited by the NLRA. The second emanates from *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976). It precludes state regulation of conduct that Congress intended to remain unregulated and to be left to the free play of economic forces. In this case, the parties agree that the conduct in question is not specifically addressed by the NLRA. Therefore, the Court will focus on whether the statutes at issue are preempted under the test set forth in *Machinists*.

In *Machinists*, it was held that Wisconsin's efforts to prohibit union workers from refusing to work overtime during collective bargaining negotiations were preempted by the NLRA. The Court inferred a Congressional intent to leave such conduct unregulated from the fact that it constituted a peaceful weapon of economic self help that Congress had refrained from including in the rather comprehensive enumeration of unfair labor practices set forth in § 8 of the NLRA. That inference was buttressed by the Court's determination that federal policy underlying the NLRA contemplates the use of economic pressure by the parties as part and parcel of the collective bargaining process. The Court concluded that Wisconsin's attempt to ban such activity constituted an impermissible intrusion into that process because allowing states to "pick[ ] and choos[e] which economic devices of labor and management shall be branded as unlawful" would enable them to alter the intended economic balance by "denying one party to an economic contest a weapon that Congress meant him to have available." *Machinists*, 427 U.S. at 149–50, 96 S.Ct. at 2557–58.

It should be noted that *Machinists* does not necessarily render a state law invalid merely because it might have some effect on labor-management relations. In *Garmon*, the Court recognized that states may enact statutes having only a peripheral impact on matters governed by federal labor law if they address concerns "deeply rooted in local feeling and responsibility." *Garmon*, 359 U.S. at 254, 79 S.Ct. at 785. However, this exception is a narrow one and is limited to legislation directly aimed at topics of vital local concern such as health or welfare benefits and the prevention of violence or tortious acts. *See, e.g., Belknap, Inc. v. Hale*, 463 U.S. 491, 500, 103 S.Ct. 3172, 3177–78, 77 L.Ed.2d 798 (1983) (holding that causes of action for employer's misrepresentation and breach of contract to replacement workers are not preempted); *New York Telephone Co. v. New York State Department of Labor*, 440 U.S. 519, 539–40, 99 S.Ct. 1328, 1340–41, 59 L.Ed.2d 553 (1979) (plurality opinion) (holding New York's payment of unemployment benefits to strikers not preempted though it indirectly affected the collective

bargaining relationship by enabling employees to remain on strike, because the purpose of the law was not to regulate the bargaining relationship, but to provide an efficient means of insuring the state unemployment system); *Youngdahl v. Rainfair*, 355 U.S. 131, 138–39, 78 S.Ct. 206, 211–12, 2 L.Ed.2d 151 (1957) (allowing picketers to be enjoined from threatening or provoking violence); *Massachusetts Nurses Assoc. v. Dukakis*, 726 F.2d 41, 44 (1st Cir.1984) (upholding a hospital cost containment law, on the ground that affordable health care was an interest deeply rooted in local feeling and responsibility and the statute only affected labor-management relations indirectly).

The instant case is similar to *Machinists* in that the activity in question constitutes a peaceful form of self help that is not prohibited by the NLRA. Indeed, an employer's hiring of replacement workers during a strike has been expressly recognized as one of the legitimate economic weapons available to management to counter the equally legitimate economic weapon of a strike by employees. *See NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 345, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938). Consequently, state efforts to proscribe such activity are preempted unless they satisfy the "local interest" test enunciated in *Garmon.*

The defendants contend that the statutes, in question, do fit within that exception. Specifically, they assert that the statutes address a matter of vital local interest because they are designed to prevent the violence that might otherwise occur if replacement workers cross picket lines. That argument falls short for two reasons. First, the challenged statutes are not directly aimed at preventing violence. Rather, they seek to regulate a facet of the collective bargaining process that Congress intended to remain unregulated. The statutes do not even proscribe acts of violence. They do nothing more than restrict an employer's right to hire replacement workers during a strike. The possibility that extinguishing that right might reduce the likelihood of unlawfully violent reactions by others is insufficient justification for such a

blunderbuss approach. The state can and must seek to achieve its ostensible objective through means that are more directly oriented toward its goal and less intrusive upon federally recognized rights. One such means might be enacting and/or enforcing laws that prohibit the violence, itself. In this case, the state has failed to do that. Instead, it has banned conduct that is lawful under the NLRA, purportedly, because others might react violently. That is tantamount to punishing the innocent for the anticipated acts of the guilty. Such a policy is both irrational and the type of direct regulation of the collective bargaining process that is not countenanced by *Machinists.*

The second flaw in the defendants' argument is that the challenged statutes have much more than a peripheral impact on federal labor law concerns. They directly and significantly limit the availability of one of an employer's principal economic weapons. In so doing, they fundamentally alter the economic balance between labor and management envisaged by the NLRA.

The defendants seek to minimize that impact by pointing out that the statutes do not totally prohibit employers from hiring replacement workers but only prevent them from doing so through third parties. That observation is inapposite to both the facts of this case and the applicable law. It ignores the plaintiffs' sworn assertions that they are almost totally dependent on nursing pools for their supply of temporary help and that prohibiting the use of such pools would, effectively, preclude them from hiring any replacements. Furthermore, it implicitly assumes that states are free to restrict federally recognized rights lying at the core of the collective bargaining process as long as they do not totally extinguish them. That assumption is patently erroneous. Preemption doctrine prohibits state action that infringes on such rights in more than a collateral way as well as action that completely eliminates them. Since the statutes in question significantly limit an employer's ability to hire replacement workers, they fall under the aegis of that prohibition. In short, a state may no

more restrict or eliminate an employer's right to hire replacement workers during a strike than it may restrict or eliminate an employee's right to obtain alternate employment during the strike.

### Conclusion

For all of the foregoing reasons, the motion of HARI and RIHCA to intervene is hereby granted; the motion of the City and the Attorney General to dismiss is hereby denied; and the clerk is directed to enter judgement in favor of all plaintiffs declaring that R.I.Gen.Laws §§ 28–10–10 and 28–10–12 have been preempted and are, therefore, unconstitutional and further permanently enjoining the defendants from enforcing those statutes.

IT IS SO ORDERED.