**SOUTHERN UNION GAS CO. d/b/a New England Gas Co.**

v.

**RHODE ISLAND DIVISION OF PUBLIC UTILITIES AND CARRIERS, et al.**

No. 02–316–T.

United States District Court, D. Rhode Island.

Feb. 13, 2004.

W. James McKay, Michael D. Chittick, Geoffrey W. Millsom, Jeffrey K. Techentin, Adler Pollock & Sheehan, Providence, RI, for plaintiffs.

Paul J. Roberti, Anne T. Turilli, Joseph R. Gaeta, Attorney General's Office, Providence, RI, for RI. Public Utilities Commission, R.I. Division of Public Utilities and Carriers, and Sheldon Whitehouse, in his capacity as Attorney General of the State of RI.

Richard M. Peirce, Adam C. Robitaille, Roberts, Carroll, Feldstein & Peirce, Inc., Dennis J. Roberts, II, Providence, RI, for United Steelworkers of America Local 12431.

### *MEMORANDUM AND ORDER*

TORRES, Chief Judge.

#### *Introduction*

Southern Union Company ("Southern") d/b/a New England Gas Company

("NEG") brought this action for injunctive relief and for a declaratory judgment declaring that Rhode Island's gas technician statute, R.I. Gen. Laws § 39–2–23, is preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et. seq.*

The parties have filed cross motions for summary judgment; but, because there are unresolved issues of material fact, both motions are denied.

### Facts

Southern is a Pennsylvania corporation. NEG is a division of Southern and is the only natural gas utility in Rhode Island. NEG employs a number of gas technicians who turn on and shut off gas service to NEG's customers. All of NEG's technicians belong to the United Steelworkers of America Local 12431 ("the Union"), which has a collective bargaining agreement with NEG.

In January 2002, the collective bargaining agreement between NEG and the Union expired and contract negotiations broke down. As a result, NEG locked out its gas technicians and utilized temporary replacement workers to help meet its operating needs.

Around that same time, legislation was introduced in the Rhode Island General Assembly to prohibit any gas company employee from turning on or shutting off gas service unless they have two years of experience working for a gas company and are certified by the Rhode Island Public Utilities Commission ("PUC"). On May 15, 2002, that legislation was enacted over the Governor's veto. It provides:

§ 39–2–23 **Safe Termination of service—Qualified Employees.** No gas company, as described in § 39–1–2(20), shall allow their employees to terminate or restore or activate gas services unless those employees have gained relevant experience by working for a gas company at least two (2) years and have been properly trained in the safe termination or activation or restoration of gas services. The same criteria shall also apply to the periodic testing of meters. A certification process of gas service employees shall be established and enforced by the public utilities commission. R.I. Gen. Laws § 39–2–23.

The lockout ended on May 28, 2002, at which time a new five-year collective bargaining agreement (the "CBA") was signed. Southern argues that § 39–2–23 is preempted by the NLRA because it restricts NEG's right to hire and use replacement workers in the event of a labor dispute. More specifically, Southern argues that the requirement of two years of experience limits the pool of potential replacement workers mainly to former NEG employees most of whom would be unsuitable because they are retired, disabled, or were fired for cause. Southern also argues that § 39–2–23 was not prompted by public safety concerns because it applies only to gas company employees and leaves independent contractors and others free to perform the work even if they do not satisfy the statutory requirements.

The State argues that there is no preemption because, although the statute may indirectly make it more difficult for NEG to hire replacement workers, it does not prevent NEG from doing so and it is, primarily, a public health and safety measure. In support of that argument, the State alleges that, during the 2002 lockout, NEG was able to maintain service by utilizing outside contractors and management personnel and that, if necessary, it could utilize Southern technicians from other locations.

### Summary Judgment Standard

Summary judgment is warranted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of "identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view all inferences to be drawn in a light most favorable to the non-moving party. *Matushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party may not defeat summary judgment merely by relying on "conclusory allegations, improbable inferences, and unsupported speculation." *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993).

### Analysis

I. *Preemption Doctrine*

A. *General Principles*

■ The doctrine of federal preemption derives from the Supremacy Clause of the United States Constitution. U.S. Const., Art. VI, cl. 2. In general, it prevents states from enacting laws that conflict with federal statutes or interfere with the accomplishment of their purpose. *See Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 540, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 108, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992); *Charlesgate Nursing Ctr. v. Rhode Island,* 723 F.Supp. 859, 864 (D.R.I.1989).

■ Preemption takes a variety of forms. Express preemption refers to cases in which Congress specifically states its intent that a federal statute should supersede state law on the same subject. *Grant's Dairy–Maine, LLC v. Comm'r of Maine Dep't of Agric., Food & Rural Res.,* 232 F.3d 8, 15 (1st Cir.2000); *Charlesgate,*

723 F.Supp. at 865. Implied preemption refers to cases in which an intent to preempt may be inferred. Intent to preempt may be inferred either from the fact that the scheme of federal regulation is so pervasive or from the fact that the federal interest in the subject matter regulated is so dominant that there is no room for state action (field preemption). Intent to preempt also may be inferred where state regulation conflicts with federal law in a way that makes it impossible to comply with both or creates an obstacle to achieving the objectives of federal law (conflict preemption). *Grant's Dairy,* 232 F.3d at 15; *Charlesgate,* 723 F.Supp. at 865.

■ In any event, the critical inquiry is "whether Congress intended that federal regulation supersede state law." *Norris v. Lumbermen's Mut. Cas. Co.,* 881 F.2d 1144, 1147 (1st Cir.1989) (quoting *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 369, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)).

B. *NLRA Preemption*

■ Since the NLRA does not expressly preempt state law, its pre-emptive effect must be determined in accordance with principles of implied preemption. *See Bldg. and Constr. Trades Council of the Metro. Dist. v. Associated Builders and Contractors of Mass./R.I., Inc.,* 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993).

■ The Supreme Court has recognized two types of implied preemption under the NLRA. The first type of NLRA preemption sometimes is called *Garmon* preemption. It precludes state regulation of activities that Congress has declared to be protected by § 7 of the NLRA and unfair labor practices referred to in § 8 of the NLRA. *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3

L.Ed.2d 775 (1959). *Garmon* preemption also extends to activities that are "arguably subject" to coverage under those sections. *Id.* at 245, 79 S.Ct. 773.

In *Garmon*, the Court vacated an award of tort damages against a labor union that engaged in picketing which, allegedly, amounted to an unfair labor practice under California law. The Court found that the California statute was preempted even though it was not clear that the picketing was protected or prohibited by the NLRA and even though the relief sought was tort damages rather than an injunction aimed directly at the picketing activity. The Court explained that "to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy," and that "[e]ven the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme." *Id.* at 247, 79 S.Ct. 773.

■ However, *Garmon* acknowledged that principles of federalism leave states free to regulate activity that is "a merely peripheral concern of the Labor Management Relations Act" or that "touch[es] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Id.* at 243–44, 79 S.Ct. 773. The "local interest" exception is a narrow one that generally is limited to "legislation directly aimed at topics of vital local concern." *Charlesgate,* 723 F.Supp. at 865.

■ The second type of NLRA preemption sometimes is called *Machinists* preemption. It preempts state regulation of any activities that Congress intended to be left unregulated. *Machinists v. Wisconsin Employment Relations Comm'n,* 427

U.S. 132, 141, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976).

In *Machinists*, the Court vacated a state court order that enjoined a union and its members from refusing overtime assignments in alleged violation of a state law prohibiting unfair labor practices. The Supreme Court found that such refusal was the kind of activity "that Congress intended to be 'unrestricted by Any governmental power to regulate' because it was among the permissible 'economic weapons in reserve, ... actual exercise (of which) on occasion by the parties, is part and parcel of the system that the Wagner and Taft–Hartley Acts have recognized.'" *Id.* The Court explained that state regulation " 'denying to one party an economic weapon Congress meant him to have available' ... is impermissible because it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 150–51, 96 S.Ct. 2548 (citing *Hill v. Florida,* 325 U.S. 538, 542, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945)). More specifically, the Court observed that "the inevitable result would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy." *Id.* at 146, 96 S.Ct. 2548 (quoting *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton,* 377 U.S. 252, 259–60, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964)).

II. *Balancing the Factors*

■ Utilization of replacement workers is an activity that is neither expressly protected nor expressly prohibited by the NLRA. However, it is one of the economic weapons of self help that Congress meant employers to have and that, therefore, Congress intended to leave unregulated. *See, e.g., Charlesgate,* 723

F.Supp. at 866 (An employer's right to hire replacement workers "has been expressly recognized as one of the legitimate economic weapons available to management to counter the equally legitimate economic weapon of a strike by employees.") (citing *NLRB v. McKay Radio & Telegraph Co.*, 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381 (1938)); *Kapiolani Med. Ctr. for Women and Children v. Hawaii*, 82 F.Supp.2d 1151, 1157 (D.Haw.2000)("The employer's right to hire replacement employees is considered an economic weapon of self-help which is permitted by federal law."); *Van–Go Transp. Co. v. New York City Bd. of Educ.*, 53 F.Supp.2d 278, 286 (E.D.N.Y.1999)("[U]nless otherwise expressly contemplated by Congress, 'States are [ ] prohibited from imposing additional restrictions on economic weapons of self-help, such as strikes or lockouts' ")(quoting *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 614–15, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986)); *Greater Boston Chamber of Commerce v. Boston*, 778 F.Supp. 95, 97 (D.Mass.1991)("Hiring replacement workers is recognized as a legitimate economic weapon of employers."). Accordingly, the issue in this case is whether § 39–2–23 impermissibly restricts NEG's ability to obtain replacement workers in the event of a strike.

In order to answer that question, it is necessary to determine the extent of the restriction; whether it amounts to more than "merely a peripheral concern of the LMRA" and/or whether § 39–2–23 "touch[es] interests so deeply rooted in local feeling and responsibility" that it cannot be inferred "that Congress [has] deprived the state[s] of the power to act." *Garmon*, 359 U.S. at 243–44, 79 S.Ct. 773. It is only by balancing these factors that this Court can ascertain whether Congress intended that the NLRA pre-empt the challenged statute.

## A. The Extent of the Restriction

It is undisputed that § 39–2–23 will make it "more difficult" for NEG to obtain replacements for NEG employees who turn on and turn off gas service to NEG's customers. The statute, effectively, excludes NEG employees who have not worked for NEG for at least two years. Consequently, it limits the pool to independent contractors who have been certified; management employees who have been certified and who have at least two years of "relevant experience"; and, possibly, other Southern employees who have been certified. What is disputed is the extent to which the statute may affect NEG's ability to obtain replacement workers.

The State argues that § 39–2–23 would not prevent NEG from obtaining whatever replacements may be necessary to continue normal operations. In fact, the State alleges that, during the 2002 lockout, NEG was able to find adequate replacements from the ranks of Southern employees and independent contractors.

Southern argues that the statute is preempted simply because it will make the process of obtaining replacements "more difficult." That argument rests on the premise that state regulation having *any* impact on an employer's ability to hire replacement workers is preempted. However, that overstates the case.

The rationale in *Machinists* was that restricting economic weapons that Congress meant to be available during the collective bargaining process presented "an obstacle" to achieving the purpose of the NLRA because it threatened to "upset the balance of power between labor and management." *Machinists*, 427 U.S. at 146, 96 S.Ct. 2548 (quoting *Morton*, 377 U.S. at 259–60, 84 S.Ct. 1253); *see Van–Go*, 53 F.Supp.2d at 284 (noting that *Machinists* preemption concerns "Congress' express decision that generally no govern-

mental regulation [may] interfere with the balance of power in union-management relations"). Moreover, as *Garmon* held, the NLRA does not preempt state regulation of activity that is "a merely peripheral concern of the LMRA." *Garmon*, 359 U.S. at 243, 79 S.Ct. 773. Consequently, it is not enough to say that § 39–2–23 will have the indirect effect of making it "more difficult" for NEG to obtain replacement workers. Southern must establish that the degree of "difficulty" rises to a level that creates more than a peripheral concern regarding NEG's ability to obtain replacement workers in the event of a strike.

## B. *The State's Regulatory Interest*

██ In determining whether activity "touch[es] interests" that are so "deeply rooted in local feeling and responsibility," *Garmon*, 359 U.S. at 244, 79 S.Ct. 773, that state regulation is not preempted, a court must consider the purpose of the regulation and its importance to the state; the extent to which the regulation serves its purpose; and whether that purpose could be achieved by alternative means that do not impact matters of federal concern.

### 1. *The Purpose of Regulation*

██ Activity that directly affects public health and safety implicates an important governmental interest. Under our system of federalism, regulation of such activity, traditionally, has been in the domain of the states. *See Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). Consequently, preemption doctrine has accorded some deference to state regulation that is designed to protect public safety. *Id.; see also Van–Go*, 53 F.Supp.2d at 291 (E.D.N.Y.1999)(citing cases holding that "legitimate public safety concerns might well warrant an exemption from pre-emption").

██ However, the mere recitation of a public safety purpose does not establish that a state has a deeply rooted interest in regulating a given activity. If the avowed purpose of the regulation is merely a pretext for achieving some other goal, a state cannot justify the regulation on public safety grounds. *See Van–Go*, 53 F.Supp.2d at 293 (noting that the defendants' asserted public safety concerns were not legitimate and appeared to have been thought up "after the event").

Here, since there is a risk that natural gas can explode if not properly handled, it seems clear that the State has an interest in ensuring that the task of connecting or disconnecting gas service is performed by qualified individuals. However, the parties disagree as to whether that is true of § 39–2–23.

NEG argues that § 39–2–23 was prompted by a desire to strengthen the Union's hand in collective bargaining and not by any concern for public safety. Thus, Southern points out that the statute was introduced and enacted during the 2002 lockout and that it applies only to gas company employees. The State, on the other hand, argues that the legislative history of § 39–2–23 clearly indicates that it was intended to protect the public safety.

### 2. *Achievement of the Purpose*

██ Even in cases where the true purpose of the regulation is to protect safety, that purpose, alone, does not place the regulation beyond the reach of preemption doctrine. The regulation, *in fact*, must serve that purpose. *Van–Go*, 53 F.Supp.2d at 292–93 (holding that purpose of protecting children by prohibiting replacement workers from driving school buses for disabled children did not prevent preemption because there was no evidence that children would actually be harmed).

In determining whether a given regulation actually serves a public safety purpose, a court must assess the practical effect of the regulation. *See, e.g., Kapiolani,* 82 F.Supp.2d at 1151; *Van–Go,* 53 F.Supp.2d at 278. Here, once again, there is a factual dispute between the parties. Southern argues that, as a practical matter, the provision in § 39–2–23 that requires at least two years of relevant experience working for a gas company contributes little or nothing to the purported goal of protecting public safety. Southern contends that there is no legitimate reason for requiring that "relevant experience" be obtained "by working for a gas company for at least two (2) years" and it points out that this requirement applies only to gas company employees and not to independent contractors who are the very individuals that the State asserts could be retained to provide necessary services in the event of a strike. The State, on the other hand, merely asserts that the experience requirement ensures that only qualified technicians will be permitted to turn gas service on and off. Neither party has presented any evidence to support its position.

### 3. *Alternative Means*

The extent of a state's interest in a particular form of regulation also may depend on whether there are alternative means of accomplishing the desired result that would have a lesser impact on matters of federal concern. *See Kapiolani,* 82 F.Supp.2d at 1156–57.

In this case, there is no evidence regarding whether the statutory provision requiring certification by the PUC is, by itself, sufficient to accomplish the ostensible purpose of insuring that only qualified technicians provide service to NEG's customers. Nor is there any evidence as to whether that purpose could be achieved in some other way that would not impact NEG's ability to utilize non employees as replacement workers.

In short, neither party has presented enough undisputed facts that entitle it to judgment as a matter of law.

Southern relies on this Court's decision in *Charlesgate,* where this Court held that a state statute prohibiting employers from using the services of a third party to recruit replacement workers during a strike was preempted by federal law. However, that reliance is misplaced. The statute in *Charlesgate* expressly and flatly prohibited employers from hiring replacement workers in the event of a strike and it served no discernible public safety purpose. 723 F.Supp. at 866. In this case, any impact of § 39–2–23 on NEG's ability to obtain replacement workers is indirect and the extent of that impact is not clear. Moreover, unlike the challenged statute in *Charlesgate,* § 39–2–23, at least ostensibly, serves an important public safety purpose.

### Conclusion

For all of the forgoing reasons, the motions for summary judgment by both the plaintiff and the defendant are denied.