**VAN–GO TRANSPORT CO., INC.,** Sterling **Coach Corp., Celebrity Transit Corp., Paul Dachs and C. Isaac Dachs, Plaintiffs,**

v.

**NEW YORK CITY BOARD OF EDUCATION, New York City, Kevin F. Gill, and Richard W. Scarpa, Defendants.**

No. CIV A 95–CV–2660 (DGT).

United States District Court,
E.D. New York.

May 19, 1999.

Robert J. Jossen, Swidler Berlin Shereff Friedman, LLP, New York City, for Plaintiffs.

Michael D. Hess, Corporation Counsel of the City of New York by Jonathan S. Becker & Susan M. Shapiro, New York City, for Defendants.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

At its core, this case is about the clash between an employer's right, under federal law, to replace striking workers, and a local governmental policy, adopted allegedly for public safety reasons, that would effectively nullify that right. The precise issue is whether the state action at issue, refusing to conditionally certify workers who would act as strike replacements, was pre-empted by federal labor law.

## Background

Plaintiffs, Paul and Isaac Dachs, are the principals of plaintiffs Van–Go, Sterling Coach and Celebrity Transit, corporations in the business of providing bus or van transportation services. In September 1988, Van–Go entered into a two year contract with the New York City Board of Education ("BOE" or "Board") that was later extended through June 30, 1996. Under the terms of that contract, Van–Go was to provide severely disabled students, who lived in buildings without elevators and who could not walk, with transportation services. The contract called for the students to be carried from their apartments by two escorts to a Van–Go van where a driver would be waiting to take them to school.

Van–Go Drivers and escorts were required to be "certified" pursuant to Articles 40 and 41 of the Van–Go/BOE contract. Langford Dep., at Exh.B. Before employees could be approved for certification, they were required to undergo a background check, mental fitness report, drug test, training course, and most relevant here, submit a "fingerprint record." *Id.* The term "fingerprint record" is not defined in the contract. The certification process often took three to six months to complete, primarily because of the length of time it took to obtain an FBI evaluation of a fingerprint record. *See* Angela Gill Dep., p. 93; Langford Dep., p. 335. Plaintiffs allege that, because of the length of time required by this last step in the certification process, BOE adopted a "uniform practice and policy" of conditionally certifying new employees. Compl., ¶ 18. Conditional certifications were approvals granted to employees who had satisfied all of the BOE's other certification requirements, but were awaiting the processing of their fingerprint reports by the FBI. The Van–Go/BOE contract also required Van–Go to supply "sufficient, qualified and approved personnel to enable the Contractor to dispatch substitute escorts promptly if, when and where necessary to ensure continuous, uninterrupted and punctual service in each and every instance." Extension and Second Amendment of Contract, § (D) at.10.[1]

In March 1994, Van–Go learned that Local 1181 planned to initiate a strike against it in early April 1994, and notified BOE of the pending strike by letter dated March 16, 1994. At first, BOE conditionally certified potential replacement workers, but then, Kevin F. Gill, Director of the BOE Office of Pupil Transportation ("OPT"), on behalf of BOE informed Van–Go by letter dated April 7, 1994, that it would not conditionally approve employees " 'to act as strike breakers.' " Pl.App. in Opp. to Mot. for Sum. J. ("Pl.App."), at Exh.40. Prior to the situation at issue, no request for consideration of conditional certifications had ever been refused. Nor was there any written policy then in effect purporting to limit the number or percentage of an OPT contractor's workers that could be conditionally certified. In July 1995, BOE enunciated by letter a policy limiting to 20% the percentage of an OPT contractor's workforce that could be conditionally certified. *See* Def. Rule 56.1 Statement, p. 34 n. 19. Richard Langford, Deputy Director for Contractual and Regulatory Affairs of the OPT, at his deposition testified that the 20% policy had been in effect prior to April 7, 1994. *See* Langford Dep., pp. 392–95. However, no such policy was mentioned in the April 7 Gill letter.

---

1. Apparently, at present, conditional certifications are granted upon running a "name check" through an Office of Court Administration ("OCA") computer. Tr., dated 2/26/99, p. 37. While an OCA "name check" is not as thorough as an FBI evaluation of a fingerprint record, it provides quick (twenty-four to forty-eight hour) access to information concerning an applicant's criminal history. *Id.* at 36–37. The practice of running applicants' names through an OCA name check began in August 1994, about six weeks after the culmination of the events that led to the present dispute. No explanation has been offered as to why it took so long to adopt this interim measure.

On June 27, 1994, Local 1181 initiated a strike against Van–Go. As a result of the strike, Van–Go was unable to perform its obligations under the contract and was defaulted by Gill on behalf of the BOE. The default was upheld following an administrative review. *See* Ltr. to Gill from Arthur H. Avedon, Administrator, dated 7/1/94.[2]

Plaintiffs then brought suit on June 30, 1995, alleging five causes of action. Plaintiffs brought two counts under 42 U.S.C. § 1983, alleging violations of federal labor law and due process. Plaintiffs also alleged several violations of state law: breach of contract, breach of duty of good faith and fair dealing, and defamation. Plaintiffs sought damages, a declaratory judgment and a permanent injunction.

In 1995, defendants moved to dismiss portions of plaintiffs' complaint for failure to state a claim upon which relief can be granted on the grounds that: (1) the complaint fails to state a claim against defendant New York City and defendant Scarpa; (2) the claim for defamation fails to state a claim; and (3) damages in the form of lost profits and to compel the award of contracts are unavailable as a matter of law. At a motion hearing on April 16, 1996, defendants' motion was denied as to plaintiffs' claims against defendants Scarpa and New York City; plaintiffs' claims for contract and lost profits damages were limited to Van–Go, as a matter of law; and decision on defendants' motion for dismissal of the defamation claims was reserved.

Both parties subsequently submitted supplemental materials in support of and in opposition to defendants' motion to dismiss the defamation claims. Because both parties submitted materials beyond the complaint, the remaining part of the motion was converted into a motion for summary judgment. Upon notice to the parties of the conversion, and additional oral argument, this remaining portion of the motion was granted in part and denied in part on February 6, 1997. *See Van–Go I*, 971 F.Supp. 90 (E.D.N.Y.1997). Following the completion of discovery, defendants moved for summary judgment on all of plaintiffs' remaining claims.

## Discussion

### (1)

BOE first argues that Van–Go's breach of contract and federal § 1983 claims are barred by a six-month contractual limitations provision contained in the Van–Go/BOE contract, and that, therefore, defendants' motion for summary judgment should be granted as to each of these claims.[3] Van–Go contends that the contractual limitations provision at issue bars neither its state nor its federal claims. That provision states:

> No action . . . shall be maintained by the Contractor [Van–Go], . . . against the Board on any claim arising out of this Contract . . . unless such action shall be commenced within six (6) months after the date of filing of the voucher for final payment hereunder or within six (6) months of the required completion date for the services performed hereunder, whichever is sooner.

Van–Go/BOE Contract, ¶ 22. A voucher is a BOE record created by BOE's Finance Department for each payment made to a vendor.

Here, the latter clause of the contractual provision is not at issue. The complaint was filed in June of 1995, one year before the June 30, 1996 "completion date" for the contract, and, thus, well within six months of the required contractual "completion date." Defendants contend, however, that the first clause bars plaintiffs

---

**2.** These events are described in greater detail in *Van–Go Transport Co., Inc. v. New York City Bd. of Ed.*, 971 F.Supp. 90 (E.D.N.Y. 1997) (*"Van–Go I "*).

**3.** Defendants raised the contractual limitations defense in their answer, but only as to plaintiffs' state law contractual claims. Defendants here seek leave to amend to assert the limitations provision with respect to plaintiffs' § 1983 claims.

from any recovery. Specifically, BOE asserts that the complaint was filed more than six months after the "final payment" under the contract was made. The term "final payment," however, is not defined anywhere in the contract. BOE maintains that the "final payment" was a $161,937 payment made by BOE to Van–Go on a voucher dated August 1, 1994. BOE asserts that since this action was commenced by Van–Go on June 30, 1995, more than six months after the August 1994 payment was made, all of plaintiffs' state and federal claims arising out of the termination of the contract are untimely.

■ Plaintiffs argue that the breach of contract and § 1983 claims are not time barred by the contractual limitations period because the August 1994 payment of $161,937 did not constitute the "final payment" under the contract. Rather, Van–Go asserts that the "final payment" under the contract was a payment of $320,378 made by BOE to Van–Go in August 1995. Van–Go maintains that since the complaint in this action was filed in June 1995, three months before the August 1995 payment was made, its claims are not time barred by the contractual limitation period.

BOE does not dispute that an additional payment was made to Van–Go in August 1995, but rather contends that the 1995 payment was a "cost justification payment" and not a "final payment" within the meaning of the Van–Go/BOE contract. BOE asserts that the cost justification payment was a retroactive payment of monies owed to Van–Go due to an increase in Van–Go's operating costs from 1990 to 1994. BOE maintains that this retroactive payment does not extend the contractual limitations period and, as such, Van–Go's breach of contract and § 1983 claims are time barred.

■ As this recitation of the parties' contending positions makes evident, there exists at least a question of material fact as to what constitutes a "final payment" under the contractual limitations period

set forth in the Van–Go/BOE employment contract. It seems more likely that the parties would have intended that the last payment received by Van–Go under the Van–Go/BOE contract would constitute the "final payment" under that contract. If BOE had intended otherwise, BOE, as drafter of the contract, should have clarified any ambiguity in the meaning of that term. It is well-settled that ambiguities in a contract should be construed against the drafter, especially when the provision being construed would cut off a party's right to obtain any remedy. *See Uribe v. Merchants Bank of New York*, 91 N.Y.2d 336, 341, 670 N.Y.S.2d 393, 396, 693 N.E.2d 740 (1998).

Accordingly, for the reason that the meaning of "final payment" under the Van–Go/BOE contract is ambiguous, that term will be construed against BOE, the drafter. "Final" means "[f]orming or occurring at the end: LAST." Webster's II: New Riverside University Dictionary 478 (The Riverside Publishing Company 1988). "Payment" means "[t]he act of paying or state of being paid." *Id.* at 864. BOE's last act of paying monies due under the Van–Go/BOE contract to Van–Go occurred, and was also "vouchered," in August 1995. Accordingly, Van–Go's action was timely brought.

■ Moreover, BOE's contention that Van–Go's § 1983 claims would have been barred by the contractual limitations provision is wholly without merit. As a general rule, contractual limitation provisions designed to shorten the three year statutory time limit must explicitly state such limitations. *See Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, ——, 119 S.Ct. 391, 396, 142 L.Ed.2d 361 (1998) (Supreme Court stated in context of Americans with Disabilities Act that "we will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.' ") (quotation omitted). An agreement shortening the time period in which to bring an action will be upheld if it

is reasonable and voluntarily agreed upon, but only if the intention to establish a shorter period is clearly set forth. *See Chase v. Columbia Nat'l Corp.,* 832 F.Supp. 654, 660 (S.D.N.Y.1993) (applying New York law).

■ Nowhere does the limitation provision in the BOE/Van–Go contract express plaintiff Van–Go's intention to waive statutorily protected federal rights. Instead, the provision merely states that "no action . . . shall be maintained by the Contractor . . . on any claim based upon or arising out of this contract." Van–Go/BOE Contract, ¶ 22. If the parties to a contract intend for a provision to act as a bar to claims brought under federal law, they must specifically refer to such federal claims, and clearly express the intent to limit the period in which a party could bring an action based upon federal claims. As the provision at issue makes no reference to federal statutory rights, much less an express waiver of such rights, it cannot bar Van–Go's § 1983 claims. Accordingly, defendant's motion for summary judgment on the basis of the contractual limitations provision is denied.

### (2)

■ Turning to the merits, plaintiffs' strongest claim is that defendant BOE's policy of refusing to conditionally certify replacements for striking workers is in conflict with the NLRA.[4] As the Supreme Court has approved and reaffirmed on numerous occasions, it is "undisputed that the NLRA preserves to employers the right to permanently replace economic strikers as an offset to the employees' right to strike." *Chamber of Commerce of the United States v. Reich,* 74 F.3d 1322, 1332 (D.C.Cir.1996) (citing *NLRB v. Mackay Radio & Tel. Co.,* 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938)) (citations omitted). In this case, defendants' policy, announced at a time when it was known to all parties involved that a strike was imminent, effectively trumped plaintiff Van–Go's ability to hire replacement workers. Whether this policy also violated plaintiff's federal rights by regulating in an area pre-empted by Congress can be determined only after reviewing the extensive body of Supreme Court case law on the subject of NLRA pre-emption.

The Supreme Court has articulated two different types of NLRA pre-emption. *See Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 613, 106 S.Ct. 1395, 1398, 89 L.Ed.2d 616 (1986) ("*Golden State I*") (citations omitted). The first has to do with the protection of legislatively articulated federal rights, while the second deals with Congress' express decision that generally no governmental regulation interfere with the balance of power in union-management relations. The first, the so-called *Garmon* pre-emption, "forbids state and local regulation of activities that are 'protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8.' "[5]

---

4. In *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 110–14, 110 S.Ct. 444, 451–52, 107 L.Ed.2d 420 (1989), the Supreme Court held that violations of the NLRA are actionable under § 1983.

5. 29 U.S.C. § 157 (Section 7 of the NLRA) protects, among other rights, the right of employees to "self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing . . . ." 29 U.S.C. § 157. 29 U.S.C. § 158 (Section 8 of the NLRA) enumerates employer and labor organization practices that constitute "unfair labor practices," including: interference with an em-

ployee's exercise of rights guaranteed under § 157; domination or interference with the formation or administration of a labor organization; discrimination in hiring or employment to encourage or discourage membership in a labor organization; the refusal to bargain collectively; forcing or requiring an employer to join a labor organization; forcing an employer to bargain with a particular labor organization as the collective bargaining agent of its employees if another labor organization has been certified as the representative of such employees; and forcing or requiring a person to stop using, selling or dealing in the products of any employer, producer or manufacturer. *See* 29 U.S.C. § 158.

*Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R.I.,* 507 U.S. 218, 224, 113 S.Ct. 1190, 1194, 122 L.Ed.2d 565 (1993) (*"Boston Harbor"*) (quoting *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959)). The Supreme Court in *Boston Harbor* noted that "[t]his rule of pre-emption is designed to prevent conflict between, on the one hand, state and local regulation and, on the other, Congress' 'integrated scheme of regulation.' " *Boston Harbor,* 507 U.S. at 225, 113 S.Ct. at 1194–95 (quoting *Garmon,* 359 U.S. at 247, 79 S.Ct. at 781). Prior to *Boston Harbor,* in *Golden State I,* the Supreme Court explained that "[t]he *Garmon* rule is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the 'integrated scheme of regulation' established by the NLRA." *Golden State I,* 475 U.S. at 613, 106 S.Ct. 1395 (quoting *Garmon,* 359 U.S. at 246, 79 S.Ct. 773).

In *Garmon,* the Supreme Court articulated two exceptions to the pre-emption doctrine enunciated therein: the so-called "local interests" exception, and the exception pertaining to "peripheral concerns." *Garmon,* 359 U.S. at 243–44, 79 S.Ct. at 779. The "local interests" exception allows States to "regulate[ ] conduct [that] touch[es] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Id.* at 244, 79 S.Ct. at 779. *See, e.g., Youngdahl v. Rainfair, Inc.,* 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957) (state court not pre-empted by NLRA from issuing permanent injunction against persistent name-calling and verbal abuse by striking employees, where such acts were calculated to provoke violence and were likely to do so); *United Automobile, Aircraft and Agricultural Implement Workers, etc. v. Wisconsin Employment Relations Bd.,* 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162 (1956) (The general rule that a State may not "enjoin conduct which has been made an unfair labor practice under the federal statutes ... does not take from the States power to prevent mass picketing, violence, and overt threats of violence. The dominant interest of the State in preventing violence and property damage cannot be questioned. It is a matter of genuine local concern.") (quotations and citations deleted). The second exception to *Garmon* pre-emption applies where "the activity regulated was a merely peripheral concern of the [LMRA]." *Garmon,* 359 U.S. at 243, 79 S.Ct. at 779. *See, e.g., Belknap v. Hale,* 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983) (employees' state law breach of contract and misrepresentation claims arising out of unfair labor practice strike not pre-empted by NLRA).

*Garmon* preemption does not, however, appear to govern the resolution of the pending dispute because *Garmon* applies only to governmental action that interferes with rights articulated by § 7 of the NLRA, or regulates conduct which constitutes an unfair labor practice under § 8, neither of which are at issue here. In any case, Van–Go relies solely on the second branch of NLRA pre-emption, the so-called *Machinists* pre-emption. *See Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976) (*"Machinists"*). *Machinists* pre-emption "prohibits regulation of areas that Congress intended to be left 'unregulated and to be controlled by the free play of economic forces.' " *Chamber of Commerce,* 74 F.3d at 1334 (quoting *Machinists,* 427 U.S. at 144, 96 S.Ct. at 2555). In *Machinists,* members of a union had engaged in a concerted refusal to work overtime during negotiations for renewal of an expired collective-bargaining agreement. *See Machinists,* 427 U.S. at 134, 96 S.Ct. at 2550. The Wisconsin Employment Relations Commission ("WERC") held that such refusal to work overtime, which was neither protected nor prohibited

by the NLRA, was an unfair labor practice under state law. *Id.* at 135, 96 S.Ct. at 2551. The Supreme Court held that the union member employees' concerted refusal to work overtime did not constitute an unfair labor practice under the NLRA. *Id.* at 158, 96 S.Ct. at 2557. Therefore, the Court concluded, WERC's decision to the contrary, based on state law, impermissibly favored employer rights over union rights, and frustrated Congress' intent to leave the area of employer-union relations unregulated by the States. *Id.* The Supreme Court explained that to " 'sanction state regulation of such economic pressure' " would frustrate Congress' intent to create a balance " 'between the uncontrolled power of management and labor to further their respective interests.' " *Boston Harbor*, 507 U.S. at 226, 113 S.Ct. at 1195; *and Golden State I*, 475 U.S. at 614, 106 S.Ct. at 1399 (quoting *Machinists*, 427 U.S. at 146, 150, 96 S.Ct. at 2556, 2558) (quotations omitted). Therefore, unless otherwise expressly contemplated by Congress, "States are [ ] prohibited from imposing additional restrictions on economic weapons of self-help, such as strikes or lockouts." *Golden State I*, 475 U.S. at 614–15, 106 S.Ct. at 1399. The Supreme Court reasoned that "[w]hether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes." *Id.* at 615, 106 S.Ct. at 1399 (quotations omitted).

There is, however, at least one recognized limitation on the *Machinists* pre-emption doctrine, the so-called "market participant" exemption:

> A State does not regulate [ ] simply by acting within one of the[ ][ ] areas [protected by the NLRA]. When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption

by the NLRA, because pre-emption doctrines apply only to state regulation. *Boston Harbor*, 507 U.S. at 227, 113 S.Ct. at 1196. The decisions of the Supreme Court in this area support a distinction between the "government as regulator and government as proprietor." *Id.* The Court has "held consistently that the NLRA was intended to supplant state labor regulation, not all legitimate state activity that affects labor." *Id.* Drawing on this precedent, defendants contend that BOE acted in the proprietary capacity of a market participant, and not in a regulatory capacity.

In *Golden State I*, the City of Los Angeles, in an effort to favor striking workers over management, refused to renew the Golden State Transit Corporation's taxicab franchise until management settled a labor dispute. The Supreme Court "refused to permit the city's exercise of its regulatory power of license nonrenewal to restrict Golden State's right to use lawful economic weapons in its dispute with its union." *Boston Harbor*, 507 U.S. at 227, 113 S.Ct. at 1196 (citing *Golden State I*, 475 U.S. at 615–619, 106 S.Ct. at 1398–1401). However, as the Court pointed out in *Boston Harbor*, "a very different case would have been presented had the city of Los Angeles purchased taxi services from Golden State in order to transport city employees." *Id.*

■ Defendants attempt to anchor the case at bar within the safe haven provided by *Boston Harbor*, while plaintiffs argue that the BOE strike replacement worker policy at issue has no place in the harbor. *See* Def. Mem. of Law, pp. 14–17. In *Boston Harbor*, the Massachusetts Water Resources Authority ("MWRA"), an independent government agency, was directed by federal court order to clean up Boston Harbor. *See Boston Harbor*, 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993). MWRA selected Kaiser Engineers, Inc. ("Kaiser"), as its project manager. As project manager, Kaiser was to advise MWRA as to work site labor-relations poli-

cy. Kaiser suggested that it be permitted to enter into a collective bargaining agreement with the Building and Construction Trades Council ("BCTC"), and MWRA agreed. The agreement included, among other provisions, a requirement that all employees hired become union members within seven days of their employment and a ten year no-strike commitment. These provisions applied equally to employees of the general contractor and to employees of any subcontractor hired to work on the contract. Bidding subcontractors were required to agree to abide by the provisions of the agreement.

The National Labor Relations Board ("NLRB") found that the agreement was valid under the NLRA. *See Boston Harbor*, 507 U.S. at 222–23, 113 S.Ct. at 1193. Non-union construction contractors brought suit against MWRA, alleging that MWRA's actions were pre-empted by the NLRA because MWRA, a state agency, was intruding into the collective bargaining process by forcing the non-union contractors to abide by the terms of the pre-hire agreement.

In concluding that the bid specification at issue, a single contract entered into between MWRA and BCTC, was "not government regulation and that it [was] therefore subject to neither *Garmon* nor *Machinists* preemption," (*Boston Harbor*, 507 U.S. at 232, 113 S.Ct. at 1199), the Supreme Court reasoned that:

> When the State acts as regulator, it performs a role that is characteristically a governmental rather than a private role, boycotts notwithstanding. Moreover, as regulator of private conduct, the State is more powerful than private parties. These distinctions are far less significant when the State acts as a market participant with no interest in setting policy .... We left open [in *Gould* ] the question whether a State may act without offending the pre-emption principles of the NLRA when it acts as a proprietor and its acts therefore are not "tantamount to regulation," or policy-making.

*Id.* at 229, 113 S.Ct. at 1197.

Notwithstanding the Supreme Court's holding in *Boston Harbor*, the Supreme Court has not allowed the exception to swallow the rule. In *Wisconsin Dept. of Indus. v. Gould Inc.*, 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), the State of Wisconsin acted as a market participant, but was pre-empted, nonetheless, from regulating in an attempt to enforce the NLRA. There, Wisconsin enacted a statute barring persons or firms found to have violated the NLRA three separate times within a five-year period from selling products to the state. *Id.* at 283–84, 106 S.Ct. at 1059–60. Wisconsin argued that its scheme escaped NLRA pre-emption because it was "an exercise of the State's spending power rather than its regulatory power," but the Supreme Court rejected that argument. *Id.* at 287, 106 S.Ct. at 1061. The Supreme Court found that, despite the arguments of the government to the contrary, "[t]he manifest purpose and inevitable effect of the debarment rule [was] to enforce the requirements of the NLRA," a decidedly regulatory exercise. *Id.* at 291, 106 S.Ct. at 1063.

Reviewing the Supreme Court's decisions in the field of federal labor law pre-emption, the District of Columbia Circuit, in *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C.Cir.1996), *reh'g denied*, 83 F.3d 439, *reh'g denied en banc*, 83 F.3d 442 (1996), stated that "when the government acts as a purchaser of goods and services NLRA pre-emption is still relevant." *Id.* at 1334. In that case, President Clinton issued an Executive Order barring the federal government from contracting with employers who hire permanent strike replacement workers during a strike. The D.C. Circuit held that the Executive Order ran afoul of the *Machinists* pre-emption doctrine, even though the government claimed it was acting as a "proprietor." *Id.* at 1339. The D.C. Circuit reasoned that "[t]he premise on which the [*Boston*

*Harbor* ] Court's [ ] analysis rested ... was that the Massachusetts governmental entity, MWRA, was not seeking to set general policy in the Commonwealth; it was just trying to operate as if it were an *ordinary general contractor whose actions were 'specifically tailored to one particular job,* the Boston Harbor clean-up project.' " *Id.* at 1336–37 (quoting *Boston Harbor*, 507 U.S. at 232, 113 S.Ct. at 1198). The D.C. Circuit opined that "[s]urely, the result [in *Boston Harbor* ] would have been entirely different, given the Court's reasoning, *if Massachusetts had passed a general law ... requiring all construction contractors doing business with the state to enter into collective bargaining agreements with the BCTC or its Massachusetts-wide counterpart containing § 8(e) pre-hire agreements.*" *Id.* at 1337. The D.C. Circuit concluded that the challenged action in that case, an Executive Order authorizing the Secretary of Labor to disqualify from certain federal contracts employers who hired permanent strike replacement workers, could not "be equated to the ad hoc contracting decision" challenged in Boston Harbor. *Id.*

Defendants contend that this case is just like *Boston Harbor* in that, here, a local governmental subdivision was required to provide a service to the public, and that governmental subdivision entered into a contract with an employer to provide that service. *See* Def. Mem. of Law, pp. 16–17. But the situation in this case is different from *Boston Harbor* in that this case involves not a single contract, but a regulatory policy that BOE incorporated into every contract it negotiated with its OPT contractors. Thus, unlike the situation in *Boston Harbor*, the policy at issue extended beyond the parties to a single contract, a critical distinction that BOE here ignores. Instead, more like the situation in *Chamber of Commerce,* BOE's asserted policy regarding its refusal to conditionally certify strike replacement workers applied equally to all OPT contractors. Thus, as much as defendants attempt to dress the issue in terms of a single, proprietary contract, BOE's policy severely curtailed, industry-wide, the ability of OPT contractors to hire strike replacement workers, a well-established, indeed, unquestioned, federal right.

BOE's argument that its certification policy was not regulatory, but contractual, is also undermined by uncontested evidence that conditional certifications were routinely granted to all OPT contractors, including Van–Go, until Van–Go requested the conditional certification of strike replacement workers. This strongly indicates that BOE's decision not to certify a conditional strike replacement work force in this case had a regulatory impetus.

Next, BOE, again seemingly undermining its own argument that the decision not to certify strike replacement workers was justified by the Van–Go/BOE *contract,* argues that BOE's refusal of Van–Go's request conditionally to certify strike replacement workers was justified by BOE's *unwritten* 20% policy. By first asserting that the disposition of this case is governed by a contractual provision, and then arguing that, in fact, BOE relied upon an alleged unwritten policy to justify its refusal to certify conditional workers, defendants advance inconsistent positions that appear to be post hoc attempts to disguise a regulatory policy.

In any event, the 20% policy was not stated as a contractual requirement, and was publicly announced in writing by BOE for the first time in July 1995, less than one month after plaintiffs commenced this action on June 30, 1995. *See* Def. Rule 56.1 Statement, p. 34 n. 19 (citing Langford Dep., pp. 392–95). Although BOE contends that the 20% policy was in effect prior to April 7, 1994, *see id.,* that claim is highly suspect. The 20% policy appears to have never been applied before; it was not reflected in any document prior to July 1995; nor was it mentioned in the critical April 7, 1994 letter from Kevin Gill to the principal of Van–Go. In that letter, Gill denied Van–Go's request for conditional

certification of a strike replacement workforce, but did not refer to this 20% policy. *See* Pl.App., at Exh.40. Nor is there any other evidence that any such policy was in effect prior to its formal memorialization in written form in July 1995. Therefore, BOE's argument that its actions were justified by a pre-existing 20% policy appears to be a pretext.

In sum, there is powerful evidence that BOE acted not in a proprietary, but in its regulatory, capacity, and with the "manifest purpose" and "inevitable effect" of throwing its weight behind one of the parties to a labor-management dispute. *Gould,* 475 U.S. at 291, 106 S.Ct. at 1064. The *Boston Harbor* market participant exception does not avail defendants in this case.

Defendants contend, nonetheless, that other legal and policy considerations dictate that defendant BOE's acts were not pre-empted by the NLRA. In support of these contentions, defendants raise a number of additional arguments, including that the "local interests" and "peripheral concerns" exceptions to *Garmon* pre-emption also apply to *Machinists* pre-emption.[6] *See, e.g.,* Def. Mem. of Law, pp. 21–23, 28 (citing *Brown v. Hotel and Restaurant Employees and Bartenders Int'l Union,* 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984); *Belknap, Inc. v. Hale,* 463 U.S. 491, 500, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983)).

In response, plaintiffs state that the *Garmon* exceptions do not apply in a *Machinists* case. While there may be some dicta in the *Brown* case that seems to suggest that the "local interests" and "peripheral concerns" exceptions do not apply in a *Machinists* type situation, *see Brown,*

468 U.S. at 503, 104 S.Ct. at 3186, there is no case from the Supreme Court to so hold.

■ In any case, clearly, the "peripheral concerns" exception has no applicability here. The state action at issue cannot realistically be said to involve matters that are peripheral to federal law. BOE's regulatory action directly curtailed an important right guaranteed to an employer under federal labor law—the right to hire strike replacement workers. Thus, defendants must rely on the "local interests" exception.

Aside from disputing the applicability of this exception factually, plaintiffs put forward a legal argument left unresolved by the case law. Plaintiffs contend that, in a *Machinists* pre-emption case, once the threshold determination is made that a challenged state action is "regulatory," no asserted "local interest" permits a state or local government to intrude upon an area pre-empted by federal law. *See* Pl. Mem. of Law, p. 24–25.

In support of their argument, plaintiffs cite the D.C. Circuit's opinion in *Chamber of Commerce.* In *Chamber of Commerce,* 74 F.3d 1322 (D.C.Cir.1996), the D.C. Circuit held that "no state or federal official or government entity can alter the delicate balance of bargaining and economic power that the NLRA establishes, whatever his or its purpose may be." *Id.* at 1337. *See also Air Transport Ass'n,* 992 F.Supp. at 1178–79 (when a state or city's regulatory action conflicts with a federally pre-empted area, it is forbidden "no matter how well-intentioned or just" its goals). Plaintiffs contend that this conclusion is bolstered by the Supreme Court's decisions in *Machinists*[7] and *Golden State I*[8] where

---

6. Defendants' remaining arguments on the pre-emption issue are discussed in n. 10, *infra.*

7. In *Machinists,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), the Wisconsin Employment Relations Commission ("WERC") entered a cease and desist order against unionized workers refusing to work overtime.

The Supreme Court held that the WERC "(entered) into the substantive aspects of the bargaining process to an extent Congress has not countenanced," and found WERC's cease and desist order to be pre-empted by the NLRA. *Id.*

the state action at issue was facially regulatory, and the Supreme Court pre-empted state action without any meaningful inquiry into motive. Hence, plaintiffs argue, defendants' argument about the "subjective motivations of [BOE] executive decision makers," Def. Mem. of Law, p. 29, and BOE's two alleged public safety goals, see, e.g., Def. Mem. of Law, pp. 21–22, 26–30, cannot save BOE once it is determined that the challenged "strike replacement policy" is a "regulatory" licensing policy.[9]

The *Chamber of Commerce* case appears to strongly support plaintiffs' argument; the Supreme Court's decisions less so. Nevertheless, every one of these cases, except for *Boston Harbor*, involve attempts by a local, state or federal governmental agency to regulate labor policy by putting a finger on the scales in favor of either labor or management. In *Boston Harbor*, the Supreme Court held that state action is not violative of the NLRA "when the state acts as a market participant *with no interest in setting policy.*" *Boston Harbor*, 507 U.S. at 229, 113 S.Ct. at 1197 (emphasis added). The emphasized language implies that motive or purpose for the governmental action may be a relevant factor in determining whether the action is pre-empted by the NLRA, as when a state, while purporting to act as a market participant, assumes the role of regulator. *See id.* at 228–29, 113 S.Ct. at 1196–97. Where, as was the case in *Boston Harbor*, the effect of the state action is not regulatory, courts do not search for a secret or hidden motive. *Id. See also Colfax Corp. v. Illinois State Toll Highway Auth.,* 79

F.3d 631, 635 (7th Cir.1996) (involving another market participation situation where a plaintiff challenged the terms of a single contract, and the court concluded that it "should not go behind the contract to determine whether the [state's] real, but secret, motive was to regulate labor."). *Boston Harbor* and *Colfax Corp.* indicate that where the actions of a state or local market participant are not facially regulatory, and the state or locality expresses no interest in setting labor policy, state action would not seem to be pre-empted. Plaintiffs, of course, argue that these cases are distinguishable because BOE's across the board policy was, on its face, regulatory.

In sum, while the cited cases are helpful to plaintiffs' argument that a regulatory policy precludes all inquiry into motive or purpose, none, however, present the issue at bar: whether a regulation adopted to address legitimate public safety concerns, such as those cited by BOE, runs afoul of Congress' pre-emption scheme, where the regulation also has the effect of favoring one side to a labor dispute.

BOE argues that its "motive" in enacting the strike replacement worker policy is relevant, Def. Mem. of Law, p. 16, and asserts that its actual purpose in enacting the strike replacement worker policy was child safety, not to favor one side in a labor dispute. That safety policy had two aspects: one, to protect the children from drivers with criminal backgrounds and, two, the avoidance of strike violence which might result in injury to the children.

---

**8.** In *Golden State I,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986), the City of Los Angeles refused to renew the Golden State Transit Corporation's taxicab franchise after the company's workers went on strike. The Supreme Court held that "the city was pre-empted from conditioning Golden State's franchise renewal on the settlement of the labor dispute." *Id.* at 618, 106 S.Ct. at 1401.

**9.** Plaintiffs also cite the Supreme Court's decision in *Gould.* There, the State of Wisconsin claimed that it was acting as a proprietor rather than as a regulator, but conceded that

the purpose of its statute had been "to deter labor law violations." *Gould,* 475 U.S. at 287, 106 S.Ct. at 1061. The Wisconsin statute, which barred the State from doing business with employers who violated the NLRA three times within a five year period, also had a clear regulatory effect. In that case, the question of motive made the issue an easy one. Where both the motive and effect of Wisconsin's statute had been to regulate labor relations, the Supreme Court held that Wisconsin's statute was pre-empted by the NLRA.

The Supreme Court's pre-emption decisions in other areas of the law appear strongly to support the conclusion that the Supreme Court would, in this case, take into consideration "the historic police powers of the State includ[ing] the regulation of matters of health and safety." *De Buono v. NYSA–ILA Medical and Clinical Servs. Fund*, 520 U.S. 806, 814, 117 S.Ct. 1747, 1751, 138 L.Ed.2d 21 (1997) (citation omitted) (ERISA). *See also Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991) (Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA")); *Hillsborough County, Florida v. Automated Medical Labs., Inc.*, 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (Public Health Service Act ("PHSA")); *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (ERISA); *Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 206, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1983) (Atomic Energy Act of 1954 ("AEA")). The Supreme Court has held that, in cases like this one, "where the federal law is said to bar state action in fields of traditional state regulation," absent a clear expression of congressional intent to the contrary, "Congress does not intend to supplant state law." *Travelers*, 514 U.S. at 654–55, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695; *De Buono*, 520 U.S. at 814, 117 S.Ct. at 1752. *See also Mortier*, 501 U.S. at 605, 111 S.Ct. at 2482; *Automated Medical*, 471 U.S. at 715, 105 S.Ct. at 2376; *Pacific Gas*, 461 U.S. at 205, 103 S.Ct. at 1723. In those cases, the Supreme Court concluded that state regulations in areas traditionally regulated by States had not been pre-empted by federal law. *See De Buono*, 520 U.S. at 814–16, 117 S.Ct. at 1752 (holding that State regulation that imposed a tax on gross receipts for patient services at hospitals, residential health care facilities and diagnostic and treatment centers, some of which were run by ERISA plans, was not pre-empted by ERISA); *Mortier*, 501 U.S. at 605, 111

S.Ct. at 2482 (holding that FIFRA did not pre-empt local governmental regulation of pesticide use); *Automated Medical*, 471 U.S. at 716, 105 S.Ct. at 2376 (holding that federal regulations governing the collection of blood plasma from paid donors did not pre-empt local ordinances which imposed additional testing requirements, including hepatitis and blood alcohol tests, upon such donors); *Travelers*, 514 U.S. at 668, 115 S.Ct. at 1683 (State regulation required hospitals to collect surcharges from patients covered by a commercial insurer, but not from patients insured by a Blue Cross/Blue Shield plan, and subjected certain Health Maintenance Organizations to surcharges that varied with the number of Medicaid recipients each enrolled; the Supreme Court held that ERISA did not pre-empt State provisions for surcharges on bills of patients whose commercial insurance coverage was purchased by employee health-care plans governed by ERISA, or surcharges on HMO's whose membership fees were paid by an ERISA plan); *Pacific Gas*, 461 U.S. at 216, 103 S.Ct. at 1728 (State regulation of nuclear power based upon economic, and not safety, concerns was not pre-empted by the occupied field of nuclear safety regulation, where the need for new power facilities and their economic feasibility were matters of traditional State concern).

These cases lead to the conclusion that BOE's motives do matter, and that legitimate public safety concerns might well warrant an exemption from pre-emption. In my view, were the Supreme Court faced with such a situation, it would almost certainly conclude that *Garmon's* "local interests" exception also applies to *Machinists* pre-emption. Here, the alleged State concerns at issue, the protection of the safety of severely handicapped children and the avoidance of labor violence, clearly fall within the realm of traditional police power.

■ Still, where a federally protected right is at stake in a field pre-empted by Congress, it cannot be enough for a state

or local governmental entity simply to suggest the existence of a rational or legitimate local interest. Rather, the governmental entity must demonstrate a substantial public health, safety or welfare concern sufficient to outweigh a party's interest in a federally protected right. To determine the validity of an asserted local interest, one must closely examine the articulated rationale behind the "local interest." For example, if the 20% regulation had been adopted by BOE well in advance of the time BOE learned of Local 1181's intent to organize a strike of Van–Go's workers and, if, in fact, the reason for the adoption of the policy had been a series of attacks on children by uncertified workers, the argument that the history of the regulation and concern for student safety should play a role in determining whether the state action at issue was pre-empted by federal law would be a compelling one. Indeed, in such circumstances, a court would make every effort to respect the state's safety concerns and to interpret case law as not invalidating the regulation. A public safety regulation which, under ordinary circumstances, no one would have questioned, should not be overturned simply because it also had the additional effect of prohibiting a contractor from hiring strike replacement workers. In other words, a regulation whose purpose and effect is to carry out a substantial public safety concern and which was not designed to tilt the balance in a labor dispute in favor of either labor or management should be upheld.

■ While there is probably a sufficient question to defeat a summary judgment motion by plaintiffs, had one been made, it is highly unlikely, as the record now stands, that defendants can prevail even if the defendants' student safety concerns are considered. The claim that there is no evidence that BOE's real or secret motive was to regulate labor is contradicted by Gill's letter and the history and the manner in which the policy of employing conditionally certified drivers had been carried

out. Clearly, therefore, even accepting the relevance of this motive, at a minimum, a triable issue of fact exists.

First, insofar as defendants' motives or purposes are concerned, defendants are confronted with the letter from Kevin Gill to the principal of Van–Go in which Gill states that he does not "intend to certify drivers and/or escorts for your company to act as strike breakers." Gill Let., at Pl. Exh.40. There is, in this statement, a barely concealed intention that illuminates the thinly veiled purpose of BOE's policy to bar Van–Go from hiring strike replacement workers, even if only to avoid being drawn into the middle of the dispute between Local 1181 and Van–Go. Thus, BOE's certification policy arguments appear to be little more than post hoc attempts to rationalize or justify BOE's decision to deny Van–Go's request for conditional certifications.

Second, and more importantly, BOE's alleged safety concerns appear to be nothing more than a chimera. BOE has failed to produce any evidence that shows that conditionally certified drivers and escorts have historically posed a substantially greater risk of harm than have workers who had been fully certified, let alone to explain why if, in fact, conditionally certified workers posed such a risk of harm, it would be acceptable to adopt a policy in which up to 20% of a company's workers could be conditionally certified. In addition, BOE has not explained why it could not have alleviated some of its safety concerns by running an OCA name check on perspective bus drivers and escorts, as it began to do approximately six weeks after Local 1181 struck Van–Go causing Van–Go to lose its BOE contract.

Moreover, with respect to concerns about strike violence, BOE has presented no evidence that any child was harmed by strike violence during the bus driver's strike in 1979 when strike replacement workers were used, or at any other time in the past. In addition, unlike a private actor who might encounter real difficulty

in dealing with actual violence, BOE had the resources of the police department readily at its disposal. BOE has failed to explain why the police could not have been called upon should violence have appeared imminent.

Finally, as to a genuine desire to avoid labor strife, BOE has failed to explain how a conditionally certified strike replacement work force represented by District 6, the union representing workers for Van–Go, would have posed any greater danger to labor peace than a fully certified replacement work force would have posed. The labor dispute between Local 1181 and Van–Go remained, whether the workers were certified or not. Labor peace could be achieved only by the elimination of District 6.

In sum, the asserted public safety concerns appear to have been thought up after the event to support BOE's anti-strike replacement worker policy. Giving BOE the benefit of every reasonable inference, what appears to have prompted BOE to deny Van–Go the right to hire replacement workers was its desire to avoid getting caught in the middle of the dispute between Local 1181, on the one hand, and Van–Go and District 6, on the other. BOE probably rightly ascertained that, in the event that Van–Go and District 6 prevailed in the dispute, Local 1181 would be a greater source of grief than Van–Go and District 6. Nonetheless, this motive is insufficient to justify BOE's interference with plaintiff Van–Go's federally protected right to hire strike replacement workers.[10]

---

**10.** Defendants raise a number of additional arguments that lack merit. Defendants first contend that the doctrine of state action immunity, historically applied to antitrust law, should apply in this situation. *See, e.g.,* Def. Mem. of Law, pp. 29 (citing *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991); *Omega Homes v. City of Buffalo,* 4 F.Supp.2d 187, 192 (W.D.N.Y.1998)). That doctrine provides that when a locality is implementing state policy, the local government and its agents are immune from liability for anticompetitive effects arising from taking actions which ultimately favor one competing economic entity over another. Defendants' immunity argument is, however, particularly misplaced given that state law expressly permits "conditionally certified" school bus drivers who have submitted their fingerprints for review to work for ninety days. N.Y. Motor Veh. & Traf. Law §§ 509–d and 509–h; 15 N.Y. Comp.Codes R. & Regs. § 6.4; Def. Rule 56.1 Statement, ¶ 12. It is BOE's own policy, and not state policy, that allegedly dictates that strike replacement workers not be conditionally certified.

Defendants further argue that BOE policy should be enforced so long as BOE had a rational basis for implementing that policy. *See, e.g.,* Def. Mem. of Law, pp. 29–30 (citing *FCC v. Beach Communications,* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 805, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). Defendants do not explain why equal protection analysis and rational basis review should apply in a NLRA pre-emption case. To prevail on this argu-

ment, one would have to accept the proposition that States may regulate in areas expressly pre-empted by Congress as long as there is a rational basis for their acts, a view of the commerce clause rejected by the Supreme Court in the early nineteenth century. *See Gibbons v. Ogden,* 22 U.S. 1, 9 Wheat. 1, 6 L.Ed. 23 (1824).

Finally, defendants' counsel contend that Local 1181 was fully justified in appealing to BOE to further Local 1181's membership goals over those of Van–Go. *See, e.g.,* Def. Mem. of Law, pp. 33–38 (citing *NLRB v. Servette, Inc.,* 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed.2d 121 (1964); *NLRB v. Fruit & Vegetable Packers,* 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964)). Again, defendants' argument misses the mark. While plaintiffs allege that BOE conspired with Local 1181 to render Van–Go incapable of performing its obligations under the Van–Go/BOE contract so as to cause Van–Go to default, plaintiffs' pre-emption claim has nothing to do with what Local 1181 might or might not have said or done to bring about such a default. The issue here is strictly whether BOE regulated in an area pre-empted by federal law.

Defendants offer a number of additional meritless arguments. For example, defendants assert that the NLRA applies only to contracts between private employers and employees acting through unions. BOE argues that it is not an "employer" within the meaning of the NLRA because contracts between localities and independent contractors are not covered by the statute. Despite defendants' argument to the contrary, it is well settled that the NLRA pre-empts the regulation of

Accordingly, for the reason that defendant BOE's policy of refusing to conditionally certify a replacement workforce for striking workers appears to be pre-empted by the NLRA, defendant's motion for summary judgment on the federal labor law claim is denied.

### (3)

■ Plaintiffs' next claim is that BOE deprived Van–Go of a property interest without due process of law. Specifically, plaintiffs assert that

> The BOE, in its zeal to take away plaintiffs' long-term contractual rights, rode roughshod over plaintiffs' due process rights *as part of a premeditated strategy*. Each act was deliberate, planned and the product of high-level decisions by authorized officials, occurring in a structured procedural environment within BOE. That procedure was implemented in a way that injured Plaintiffs' valuable rights without basic due process rights.

Pl. Mem. of Law, p. 41. Even taking plaintiffs' assertions to be true, defendants' motion for summary judgment on the due process claim should be granted.

As the Second Circuit has explained, "[i]n order to sustain an action for deprivation of property without due process of law, a plaintiff must 'first identify a property right, second show that the state has deprived him of that right, and third show that the deprivation was effected without due process.'" *Local 342, Long Island Pub. Serv. Employees, UMD, ILA, AFL–CIO v. Town Bd. of Huntington,* 31 F.3d 1191 (2d Cir.1994) (quoting *Mehta v. Surles,* 905 F.2d 595, 598 (2d Cir.1990)) (*per curiam*). While it is not at all clear that Van–Go had a property right in the Van–Go/BOE contract, this issue need not be resolved. *See, e.g., id.* at 1194–96 (breach of contract not ordinarily constitutionally protected property interest); *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335 (2d Cir.1994) (where a BOE contract gives Board considerable discretion, contractor has no constitutionally protected property rights). Even assuming that Van–Go had a property interest that was deprived by the State, Van–Go has not, and cannot, offer sufficient evidence from which a reasonable jury could conclude that such a deprivation was effected without due process.

In *Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877 (2d Cir.1996), a case to which both parties refer in their memoranda, the Second Circuit noted that "[w]hen reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Id.* at 880 (citing *Hudson v. Palmer,* 468 U.S. 517, 532, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984); *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). The Court explained that in the case of random, unauthorized acts, "the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful postdeprivation remedy." *Id.* (citing *Hudson v. Palmer,* 468 U.S. at 531–33, 104 S.Ct. at 3202–04). In contrast, the Court noted that "[w]hen the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, ipso facto, satisfy due process." *Id.* (citing *Hudson v. Palmer,* 468 U.S. at 532, 104 S.Ct. at 3203; *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 435–36, 102 S.Ct. 1148, 1157–58, 71 L.Ed.2d 265 (1982)). The Second Circuit expounded

---

union-management relations by a municipal body, and that the BOE need not be an "employer" within the meaning of the NLRA to be pre-empted from engaging in such regulatory activity. *See* discussion of pre-emption doctrine, *supra.*

that "[t]he Supreme Court's different treatment of the two situations rests on pragmatic considerations." *Id.* (citing *Hudson v. Palmer*, 468 U.S. at 532–33, 104 S.Ct. at 3203–04). The Court explained that:

> When a deprivation occurs because of a random, arbitrary act by a state employee "[i]t is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under 'color of law,' is ... almost ... [invariably] beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation."

*Id.* (quoting *Hudson v. Palmer*, 468 U.S. at 532, 104 S.Ct. at 3203) (citations omitted). The Court concluded that " '[t]he controlling inquiry is solely whether the state is in a position to provide for predeprivation process.' " *Id.* (quoting *Hudson v. Palmer*, 468 U.S. at 534, 104 S.Ct. at 3204).

Here, plaintiffs contend that defendants' acts were not random or unauthorized. Yet, somewhat paradoxically, plaintiffs do not expressly argue that the alleged due process violation at issue was caused by an "established state procedure." Rather, plaintiffs' claim that high-level BOE officials plotted to deprive Van–Go of its property rights to the Van–Go/BOE contract. Thus, despite plaintiff's contentions to the contrary, plaintiff's claim states a classic case of random, unauthorized acts by individual state or local officials. Accordingly, as the Second Circuit noted in *Hellenic American Neighborhood*, "[plaintiff's] claims can survive only if New York does not provide adequate postdeprivation procedures." *Hellenic American Neighborhood*, 101 F.3d at 881. This, however, is not the case. *See id.*

The Second Circuit has "held on numerous occasions that an Article 78 proceeding is a perfectly adequate postdeprivation remedy" in cases based on random and unauthorized acts by state employees. *Id.* (citing *Interboro Inst., Inc. v. Foley*, 985 F.2d 90, 93 (2d Cir.1993); *McDarby v. Dinkins*, 907 F.2d 1334, 1338 (2d Cir.1990); *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 888 (2d Cir.1987); *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir.1984)). Here, plaintiffs could have brought an Article 78 proceeding in state court to vindicate what they believed was a violation of a protected property interest, but chose not to. Plaintiffs cannot now complain that the alleged deprivation of property was effectuated without due process. Accordingly, for the reason that plaintiffs received all of the process that was due, defendants' motion for summary judgment on the due process claim is granted.

(4)

■ Turning to plaintiffs' state law claims, plaintiffs first allege that defendants breached the Van–Go/BOE contract by interfering with plaintiff Van–Go's ability to perform its obligations under the contract. Defendants contend that Van–Go, not defendants, breached the contract by failing to supply the Board with sufficient certified drivers and escorts to transport the severely disabled students covered by the Van–Go/BOE contract to school and that, therefore, summary judgment on plaintiffs' breach of contract claim should be granted. For the reasons that: it is not clear that the contract required employees to undergo a fingerprint check as a precondition to obtaining certification; if the contract did require such a fingerprint check, it appears that defendants waived it; and defendants appear to have breached their duty of good faith and fair dealing, defendants' motion for summary judgment on the breach of contract claim is denied.

The Van–Go/BOE contract states, in pertinent part, that the contractor shall use "certified" drivers and escorts, "shall send all driver/escort applications for employment to the Director [of the OPT], and follow the procedures established by the Director for the submission of the *finger-*

*print record* and [other material] for each applicant ... No operator shall be employed on Board of Education work until [the] fingerprint record [and other material] have been approved by the Director ...." Langford Aff., at Exh.B (quoting Van–Go/BOE Contract, ¶¶ 40–41 (emphasis added)).

While it is clear from the plain meaning of the contract that to fulfill the contractor's contractual obligations "certified" drivers and escorts were required to be supplied, the term "certified" is not clearly defined within the four corners of the contract. While there is no dispute that defendant BOE adopted an interpretation of this provision that would require drivers and escorts to undergo a complete fingerprint review in advance of their employment, it is not at all clear that the contract, as written, states such a requirement. It seems plausible that the "fingerprint record" referred to in the contract consist of a set of fingerprints taken from a prospective driver for FBI analysis. A fingerprint "report," as it is called in defendant Gill's Reply Affidavit, might be quite a different item. Gill Reply Aff., ¶ 24.

Advancing this interpretation of the contract, plaintiffs argue that "the Director [of BOE] is not required to wait for the FBI report to be returned before approving certification, nor precluded from approving certifications on a 'conditional' basis before that time." Pl. Mem. of Law, p. 32 n. 34. Indeed, state law permits conditional certification of a school bus driver "who is not otherwise disqualified ... [for the] period of time necessary to review information regarding the prior criminal history of the applicant." N.Y. Veh. & Traf. Law § 509–h. Thus, plaintiffs argue, drivers and escorts could be "certified" by OPT when the Director receives a record of the prospective worker's fingerprints. *See* Pl. Mem. of Law, p. 32 n. 34.

Defendants vigorously object to plaintiffs' proposed interpretation of the contract, claiming that plaintiff Paul Dachs, himself, on numerous occasions acknowl-

edged that BOE's certification provision required that an FBI fingerprint analysis be completed prior to certification. Plaintiff Dachs, however, is not a lawyer. His understanding of what BOE asserted was its certification policy, both orally and in various memoranda, is not binding as an admission of what the contract's terms actually required. Nor did Dach's acceptance of defendants' contractual interpretation modify the contract to require fingerprint analysis before drivers and escorts could start working. The parties clearly manifested the intent, as reflected by a consistent course of dealing, not to require such analysis prior to allowing drivers and escorts to work. Furthermore, if the BOE contract, either as written or in practice, had, as defendants contend, actually required a fingerprint analysis prior to certification, there would have been no need for BOE to adopt—subsequent to the strike—a policy limiting to 20% the number of an OPT contractor's employees that could work with only a conditional certification, i.e., without an FBI fingerprint analysis.

All together, there is no clear evidence that the Van–Go/BOE contract, as written or otherwise, required a fingerprint analysis to be completed before certification could be granted. Again, any ambiguities in the contract should be construed against defendants as drafters of the contract.

More importantly, even if the contract, as written, contained a fingerprint clearance requirement, defendants appear to have waived that requirement through a consistent course of conduct. While the goal of screening persons whose jobs will require them to come into contact with children on a daily basis is, indeed, a laudable and worthy one, defendants routinely certified, on a conditional basis, drivers and escorts whose fingerprints had not undergone FBI analysis. All of the OPT contractors often needed drivers on short notice to fill vacancies and to service the needs of growing student populations. *See* Langford Dep., p. 330. Given that finger-

print clearances took between three and six months to process, *see* Angela Gill Dep., p. 93; Langford Dep., p. 335, new and replacement drivers could not be hired on short notice to accommodate the needs of OPT contractors. Neither OPT contractors, who had contractual obligations to perform, nor potential employees, could be expected to wait six months for a BOE certification. Nor could contractors, given the exigencies of the school busing industry, including non-year-long employment and changes in student populations, reasonably be expected to keep on hand a supply of pre-certified workers sufficient to guarantee that conditional certifications would never be necessary. If the OPT contractors were to maintain such a reserve work force, the cost of maintaining it would be substantial and would ultimately have to be paid out of BOE's budget. In apparent recognition of these facts of life, BOE continuously ignored its own stated contractual interpretation by granting conditional certifications in the absence of FBI fingerprint reports. Indeed, plaintiffs contend, and defendants do not deny, that prior to April 7, 1994, BOE never withheld conditional certification of a new applicant whose application was otherwise in order pending the receipt of an FBI fingerprint report. *See* Pl. Rule 56.1 Statement, ¶ 3. While BOE announced, on occasion, various policy initiatives purporting to end the practice of granting conditional certifications, these proclamations were hollow; they were never followed through, again, no doubt, because ultimately the additional costs would have to be borne by BOE. *See, e.g.,* Def. Rule 56.1 Statement, at Exhs.H, T, Q, R, S, U, V, W, X, MM.

In sum, even if the Van–Go/BOE contract had specified that Van–Go could not use "conditionally" certified drivers and escorts, given defendants' unbroken record of providing certifications, conditional or otherwise, to Van–Go and the other OPT contractors, BOE was not free to unilaterally invoke an unenforced prohibition purposefully to exclude strike replacement workers so as to discriminate against such

employers and undermine federal labor law policy. *See In re Schanzer's Estate*, 7 A.D.2d 275, 182 N.Y.S.2d 475 (1st Dept. 1959) ("A contract [provision] duly executed and thereafter abandoned or ignored by the contracting parties is unenforceable."), *aff'd by summary order*, 8 N.Y.2d 972, 204 N.Y.S.2d 349, 169 N.E.2d 11 (1960). *See also Restatement (Second) of Contracts* § 223(2) ("Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies the agreement.").

Defendants' final contention on this branch of its argument is that the provision regarding full certification, and the corresponding fingerprint analysis requirement, could not be waived absent a signed writing from the director of BOE. As no such writing was ever signed, BOE contends that there was no waiver of the fingerprint analysis requirement. This argument also does not withstand scrutiny.

The Van–Go/BOE contract contains a non-waiver provision that provides:

A. No waiver by the Board of any term or condition hereof shall be effective unless in writing and signed by the Director or his designee. Any waiver shall be specifically limited to its terms, and shall not be deemed applicable to subsequent like circumstances.

B. Any purported oral waiver shall be void.

Langford Aff., at Exh.B, p. 63. Significantly, this contractual provision, as written, does not provide that it cannot be altered by a course of conduct. Notably, parties seeking to limit the effect of the waiver of contractual rights through a course of conduct inconsistent with terms of the contract have employed non-waiver provisions stating that "the failure of either party to enforce any provision of this Agreement shall not be deemed a waiver of such party's right to enforce such provision in the future." *Busler Enterprises, Inc. v. MG Refining & Marketing, Inc.*, No.96 Civ. 3590, 1997 WL 672018, at *1 (S.D.N.Y.

Oct. 29, 1997) (containing such a non-waiver clause). *See also Colonia Ins., A.G. v. D.B.G. Property Corp.,* No.89 Civ. 8640, 1993 WL 100221, at *2 (S.D.N.Y. March 29, 1993) (interpreting New York law to provide that where such a waiver clause is employed, it acts as a bar to a defense that contractual rights have been waived by a course of conduct). As no similar clause was included in the Van–Go/BOE contract, it can, but need not, be inferred that the parties did not intend for the non-waiver provision at issue to apply to the consistent failure of one of the parties to the contract to enforce one of its key contractual terms.

Finally, defendants appear to have breached their duty of good faith and fair dealing by interfering with Van–Go's ability to perform its obligations under the contract. Every contract contains an implied condition that one party will not prevent performance by the other party. *See, e.g., Kooleraire Serv. & Installation Corp. v. Board of Educ. of the City of New York,* 28 N.Y.2d 101, 106–07, 320 N.Y.S.2d 46, 48–49, 268 N.E.2d 782 (1971) (low bidder on contract unable to perform and entitled to damages for breach because BOE contract urged comptroller to unjustifiably withhold requisite certification); *Grad v. Roberts,* 14 N.Y.2d 70, 75, 248 N.Y.S.2d 633, 637, 198 N.E.2d 26 (1964) (parties to a contract are under an implied obligation to exercise good faith not to frustrate performance of contracts into which they have entered). Similarly, a party to an executory contract breaches that contract by preventing performance and may be liable for damages. *See Dwyer v. Interborough Rapid Transit Co.,* 241 N.Y. 616, 150 N.E. 578 (1926); *Tascone Slate Roofs, Inc. v. Quadrozzi,* 184 A.D.2d 633, 584 N.Y.S.2d 892 (2d Dept.1992) (defendant frustrated plaintiff's ability to complete construction and was held liable to contractor); *A.W. Fiur Co. v. Ataka & Co.,* 71 A.D.2d 370, 375, 422 N.Y.S.2d 419, 423 (1st Dept.1979) ("change in the method of [defendant's] business operations during the term of the contract, where such change prevents rendition of the services by the other party to

the contract, constitutes a breach of contract, importing damages") (citations omitted). Moreover, a determination as to whether activities were undertaken in good faith depends partly on an analysis of motive and should generally be made by a trier of fact. *See, e.g., Carvel Corp. v. Diversified Mgmt. Group, Inc.,* 930 F.2d 228, 230 (2d Cir.1991) (party to contract claiming that other party to contract "unjustifiably frustrated" its efforts to perform under agreement in breach of implied duty of good faith "is entitled to have the jury instructed as to his claims and theories of law if supported by the evidence and brought to the attention of the court"); *Schwartz v. Marien,* 37 N.Y.2d 487, 493, 373 N.Y.S.2d 122, 128, 335 N.E.2d 334 (1975) (holding that it is appropriate for "[d]eterminations as to whether the activities of defendants were undertaken in good faith for a legitimate corporate purpose" to go to the jury).

Here, defendants refused to certify a conditional strike replacement workforce at a time when it was known to defendants that a strike was imminent. The discretion given to the Director of OPT to approve certifications carried with it an implied obligation on the part of BOE to approve new drivers and escorts to be certified when and if needed to perform the contract services. *See* Def. Rule 56.1 Statement, ¶ 21 (quoting 1988 Agreement ¶¶ 40, 41). As discussed above, defendants' refusal to certify a replacement workforce appears to have been in violation of federal law. This likely violation of federal law caused plaintiffs to be unable to perform under the terms of the Van–Go/BOE contract. As such, defendants' actions would appear to have constituted an unwarranted and illegal interference with Van–Go's performance of the contract.

In addition, BOE's refusal to certify a replacement workforce probably encouraged Local 1181 to strike. Local 1181's leadership knew that if Van–Go could not field sufficient drivers and escorts to meet

its transportation obligations, Van–Go would be defaulted on its contract and a contractor with drivers represented by Local 1181 would receive Van–Go's contract. The replacement contractor was to earn a staggering $21 million dollars more than Van–Go would have earned over a six year period if the number of drivers and vans servicing the contract remained the same, and over $57 million more if the number of vans employed in servicing the contract increased at a rate of thirty percent per year. *See* Pl.App., Exh.120. BOE cannot and does not explain this conspicuous waste of taxpayer money, much less, how its actions in precipitating Van–Go's default on the Van–Go/BOE contract were a good faith exercise of its rights under the contract.

At the very least, there remain a number of questions of fact to be determined. Accordingly, for the foregoing reasons, defendants' motion for summary judgment on Van–Go's state law contract claim is denied.

### (5)

Defendants next contend that the breach of contract claim should be dismissed for failure to join Evergreen, the contractor that took over the Van–Go/BOE contract, as an indispensable party. Federal Rule of Civil Procedure 19(a) provides that a party should be joined if his or her presence will not deprive the court of subject matter jurisdiction and if, in her or his absence, (1) complete relief cannot be accorded those already parties, (2) she or he claims an interest related to the action and

may be prejudiced by the continuation of the action in his or her absence, or (3) his or her absence may prejudice someone already a party. *See* Fed.R.Civ.P. 19. If joinder under Rule 19(a) is deemed necessary, but is not feasible, analysis continues under Rule 19(b). *See* Fed.R.Civ.P. 19(b).

Here, plaintiff is plainly seeking damages against BOE. Accordingly, defendants' motion to dismiss for failure to join an indispensable party is denied.[11]

### (6)

Defendants' last substantive contention revisits the issues addressed in *Van–Go Transport Co., Inc. v. New York City Bd. of Ed.*, 971 F.Supp. 90 (E.D.N.Y.1997) (*"Van–Go I"*). There, defendants moved to dismiss plaintiffs' defamation claims, and that motion was converted to a motion for summary judgment. *Id.* That decision thoroughly discussed the factual and legal underpinnings of plaintiffs' defamation claims. Defendants' motion for summary judgment as to plaintiffs' claim that the Gill letter was defamatory was granted, but plaintiffs' remaining defamation claim, which was "best seen as one for compelled self publication," survived. *Id.* at 102. That claim arose out of a letter written by defendant Richard Scarpa and mailed to plaintiff at plaintiff's request. *See id.* at 96. The Scarpa letter set forth allegations of bribery against the principals of Van–Go. *See id.* at 100. Plaintiffs were required to report these allegations of criminal misconduct, as part of the City's bidding requirements, on a Vendex questionnaire when they sought

---

11. To the extent that plaintiff Van-Go, in its complaint, also seeks injunctive relief: against awarding the Van-Go/BOE contract to any other contractor, and requiring defendants to award that contract to plaintiffs Van-Go, Celebrity or Sterling, such relief cannot be granted. As defendants argued in their Memorandum of Law in Support of Their Motion to Dismiss Portions of the Complaint ("Def. Mem. of Law I"), "it is black letter law in New York that a court cannot compel a discretionary act and, hence, cannot direct the award of a contract." Def. Mem. of Law I, p. 22 (citing *Burke's Auto Body, Inc. v. Ameruso*, 113 A.D.2d 198, 200–01, 495 N.Y.S.2d 393, 395–96 (1st Dept.1985)). Nor can a court make an award of lost profits on a contract that was sought but not awarded. *See* Def. Mem. of Law I, p. 21 (citing *Woods Advertising v. Koch*, 178 A.D.2d 155, 577 N.Y.S.2d 22 (1st Dept.1991); *Stride Contracting Corp. v. Bd. of Contract and Supply City of Yonkers*, 181 A.D.2d 876, 581 N.Y.S.2d 446 (2d Dept.1992); *Carroll–Ratner Corp. v. City Manager of New Rochelle*, 54 Misc.2d 625, 630, 283 N.Y.S.2d 218, 224 (Sup.1967), aff'd, 36 A.D.2d 795, 320 N.Y.S.2d 715 (2d Dept. 1971)).

another City contract. *See id.* at 100. The Vendex questionnaire was then incorporated into the City's Vendex system, which resulted in the allegations of misconduct appearing in every bid for a City contract submitted by plaintiffs.

While there is "scant law" on the issue of compelled self publication in New York, my conclusion was that "[i]t seems reasonable to assume that the New York Court of Appeals would adopt the doctrine in a form that allowed for liability where, such as in the instant case, there was a high degree of compulsion that required the reporting of the defamatory matter." *Id.* at 102, 104. I then found that plaintiff "ha[d] sufficiently pled both elements of compelled self publication," to wit, that "it was foreseeable that the [libelous] allegation would be reproduced by plaintiffs," and that plaintiffs would be compelled to report the libelous allegation when submitting a new bid. *Id.* at 104. However, a "[q]ualified privilege attaches to otherwise actionable defamatory words when [a] communication [is] made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty . . . if made to a person having a corresponding interest or duty." *Id.* (quotations and citations omitted). The communication at issue here "is precisely the kind that a privilege is intended to cover: a statement alleging bribery of a government official would be an allegation that City agencies attempting to award contracts to responsible bidders would wish to be informed of, and it is a matter of common concern." *Id.* at 105.

It is well established, however, that a qualified privilege is not unlimited, and "[t]he shield provided by a qualified privilege may be dissolved if plaintiff can demonstrate that defendant spoke with 'malice.'" *Id.* (citations omitted). While plaintiffs pled that defendants acted with malice, they provided no evidence of either actual or common law malice upon which a jury could infer that such malice existed. *Id.* at 106. Nevertheless, summary judg-

ment was not proper, at that point, because plaintiffs "ha[d] not had the opportunity to depose Scarpa or other relevant parties on the issue of malice." *Id.* at 107. "[P]laintiffs [were] entitled to the opportunity to gather evidence to overcome the qualified privilege." *Id.* (citations omitted).

▉ Now, plaintiffs have had the opportunity to depose and, indeed, have deposed, Richard Scarpa, Kevin F. Gill, Angela Gill, and Richard J. Langford. Plaintiffs have also conducted additional discovery. Plaintiffs, however, have failed to present any evidence of malice. Indeed, plaintiffs' counsel, apparently acknowledging the lack of evidence of malice, allocated only two paragraphs in their fifty page memorandum of law to discussing the remaining defamation claim. At oral argument, however, plaintiffs' counsel, for the first time, raised several theories upon which counsel contended a finding of malice could be based.

First, plaintiffs' counsel argued that the fact that the defamatory letter was disseminated to the Board of Review, without investigation, suggested malice on the part of defendant Gill who passed the letter on to that panel, and defendant Scarpa who signed the letter. *See* Tr., dated 2/26/99, pp. 7–15. This, however, cannot establish malice. A public employee has an obligation to report hearsay evidence of bribery to the appropriate body or official. Often this kind of hearsay information will, after further investigation, reflect reality. Moreover, a public employee without investigative responsibilities is under no obligation to conduct an independent review before passing such information to the appropriate authorities. Here, the Board of Review was certainly an appropriate authority to which to send the letter; plaintiffs' counsel has suggested no other reasonable alternative.

Plaintiffs' counsel also contended that BOE's failure to retract the defamatory publication from the City's Vendex system is evidence of malice. *See* Tr., dated

2/26/99, pp. 6, 15–21. Counsel argued that despite the fact that there was never any investigation of the alleged bribery noted in the Scarpa letter, nor any finding of culpability, the defamatory remarks were never taken off of Vendex. Plaintiffs argue that Gill or BOE had a duty to correct the Vendex entry, while the defendants claimed at oral argument that plaintiffs were in a position to obtain a correction of the records—which one of the individual plaintiffs claims he tried unsuccessfully to do. Neither party has been very enlightening on how corrections in the Vendex system can be obtained. This failure falls more heavily on the plaintiff who has the burden of proof on this issue. Nonetheless, this question need not be definitively resolved. Whether or not a duty on the defendants' part to correct the Vendex record existed, there is no evidence in any of the affidavits, exhibits or deposition testimony submitted by the parties that could support a finding that Gill or BOE failed to correct the Vendex entry out of malice. Accordingly, defendants' motion for sum-mary judgment on plaintiffs' remaining defamation claim is granted.[12]

### (7)

▉▉▉▉▉ Defendant Gill asserts that the federal right at issue in the labor law claim was not "clearly established" at the time of his conduct and that, therefore, the labor law claim against him must be dismissed under the doctrine of qualified immunity. *See* Def. Mem. of Law, pp. 48–49. As articulated by the Second Circuit, the doctrine of "[q]ualified immunity will shield from suit a government official sued in his or her individual capacity unless the official's conduct violates clearly established law or such conduct was not objectively reasonable 'in light of the legal rules that were "clearly established" at the time it was taken.'" *Kulak v. City of New York*, 88 F.3d 63 (2d Cir.1996) (citation omitted). The availability of the defense depends upon whether a reasonable public official could have believed his or her actions to be lawful "in light of clearly established law and the information [he or she] possessed." *Weyant v. Okst*, 101 F.3d 845, 858 (2d Cir.1996) (citations and quotations omit-

---

**12.** It should be noted that, although defendants' motion for summary judgment on the remaining defamation claim is being granted, defendants have not done themselves any favors by citing to the Second Circuit's summary order in *Kenney v. Kemper Nat'l Ins. Cos.*, 133 F.3d 907, 1998 WL 29815, at *1 (2d Cir.1998). This decision may not be cited as precedential authority under the rules of this Circuit. *See* Second Circuit Rule 0.23. This should come as no surprise to the experienced counsel who placed their names on defendants' memorandum of law. In any event, the summary order does not even stand for the proposition for which it is cited.

First, contrary to what defendants contend, the Second Circuit did not, in its summary order, affirm the district court's holding that New York law does not recognize a claim for compelled self publication. Rather, the Court simply concluded that numerous allegations in the plaintiff's complaint, including the plaintiff's defamation claims, failed to state a claim on which relief could be granted, "substantially for the reasons stated" by the district court. *Kenney*, 1998 WL 29815, at *2. The district court in *Kenney* decided the defamation issue on alternative grounds before opining that New York law did not recognize

a cause of action for compelled self publication. Accordingly, it is quite a stretch to say that the Second Circuit, even in non-precedential authority, agreed that New York law would not recognize a cause of action for compelled self publication.

Second, while the district court in *Keeney v. Kemper Nat'l Ins. Cos.*, 960 F.Supp. 617 (E.D.N.Y.1997) concluded, based solely upon the First Department's decision in *Wieder v. Chemical Bank*, 202 A.D.2d 168, 169, 608 N.Y.S.2d 195, 196 (1st Dept.1994) (rejecting claim of compelled self publication in case of lawyer discharged for misconduct), that "New York does not recognize [a] cause of action for 'compelled self publication,'" the decision in *Wieder* rests on the holding of *Weintraub v. Phillips, Nizer, Benjamin, Krim & Ballon*, 172 A.D.2d 254, 255, 568 N.Y.S.2d 84 (1st Dept.1991). As I noted in *Van–Go I*, the facts of the *Weintraub* case "did not demonstrate compelled self publication, [ ] nor was the issue of compelled self publication actually considered." *Van–Go I*, 971 F.Supp. at 102–03. Accordingly, the district court's opinion in *Kenney* would not affect this court's analysis of whether the New York Court of Appeals would recognize a cause of action for compelled self publication.

ted). A federal law is "clearly established" when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Doe v. Phillips,* 81 F.3d 1204, 1211 (2d Cir.1996), *cert. denied,* 520 U.S. 1115, 117 S.Ct. 1244, 137 L.Ed.2d 326 (1997). The Second Circuit instructs that "[t]o determine whether a right was clearly defined at the time the defendant acted, a court should consider":

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Id.* (citation omitted). The doctrine of qualified immunity is only applicable to individuals. *See Rodriguez v. City of New York,* 72 F.3d 1051 (2d Cir.1995).

▪ Here, the right violated by Gill was based on a "clear line of federal law" that plaintiffs had a federal right to use strike replacement workers. *See, e.g., NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938); *TWA, Inc. v. Ind. Fed. of Flight Attendants,* 489 U.S. 426, 433, 109 S.Ct. 1225, 1230, 103 L.Ed.2d 456 (1989). Unlike the situation in *Kulak,* the case cited by defendants, there is no question that defendant Gill was "on notice" that his actions implicated a federal right.[13] Indeed, plaintiffs and their counsel unambiguously and repeatedly, both orally and in writing, advised Gill of this well-established federal right, and even cited Supreme Court cases to Gill. *See* Pl. Rule 56.1 Statement, ¶¶ 46–47. Indeed, on March 23, 1994, Van–Go's counsel wrote to Gill: "It is our firm and unyielding position that any action with intent to disrupt

ongoing operations of the company ... is patently illegal and the company is fully authorized by law to permanently replace all offending employees." Pl.App., at Exh.39. *See also id.* at Exh.41. In the face of such notice, it was not "objectively reasonable" for Gill not to have known that his conduct was violating federal law: the right to replace striking workers was defined with reasonable specificity; and the decisional law of the Supreme Court and the Second Circuit support the existence of such a right. *See Doe v. Phillips,* 81 F.3d at 1211. Accordingly, under preexisting law, a reasonable public official would have understood that her or his refusal to certify conditional strike replacement workers might well be unlawful. *Id.*

### (8)

▪ Finally, in a one-sentence footnote, defendants argue that the City of New York should be dismissed as a defendant because "the record evinces no involvement of the defendant City of New York or any of its officials regarding the facts in suit." Def. Mem. of Law, p. 49 n. 13. Here, the record developed in discovery contains evidence from which a factfinder could infer the City's "involvement." *See* Pl. Rule 56.1 Statement, ¶¶ 48–51. For example, payments made to Van–Go under the Van–Go/BOE contract were made by the City; BOE is represented by Corporation Counsel, the City's counsel; there is evidence that the City and BOE consulted each other and shared decision-making on matters relating to Local 1181, bus contracting and budgets; and BOE has represented to various third parties that the City, and the Mayor's Office in particular, was involved in the "overall strategy" of dealing with Van–Go's labor problem. *See* Pl. Rule 56.1 Statement, ¶¶ 48–51. *See also* Dachs Aff., at Exh.A. Thus, the "involvement" of the City has been sufficiently documented to raise a

---

**13.** *Kulak v. City of New York,* 88 F.3d 63 (2d Cir.1996) concerns an alleged "federal right" that was without any precedent. *Id.* at 76 (holding that "[n]o clear line of federal law

establishes that it is a 'substantial departure' from accepted practice for a physician to fail to inform a patient of the risks of psychotropic medications.").

genuine issue of material fact concerning the City's involvement in formulating and guiding BOE policy. Accordingly, defendants' motion to dismiss the City as a defendant is denied.

## Conclusion

For the foregoing reasons, defendants' motion for summary judgment is: denied as to plaintiffs' federal labor law claim; granted as to plaintiffs' federal due process claim; denied as to plaintiffs' state law contracts claim; and, granted as to plaintiffs' remaining defamation claim. Defendants' motions to dismiss defendant Gill under the doctrine of qualified immunity and defendant New York City for lack of proof of the City's involvement in assisting BOE to formulate and implement the policy at issue are denied.

SO ORDERED.